McKenna Process Company of Illinois, Appellee, v. Blatchford Corporation, Appellant.

Gen. No. 9,464.

102

Heard in this court at the October term, 1939. Opinion filed February 17, 1940. Rehearing denied March 19, 1940.

REID, O'CONNOR, WEBB & O'MALLEY, and JOHN G. PLAIN, all of Aurora, and ALEXANDER C. MABEE, of Chicago, for appellant.

JOHN K. NEWHALL, of Aurora, and SNAPP, HEISE & SNAPP, of Joliet, for appellee.

MR. PRESIDING JUSTICE WOLFE delivered the opinion of the court.

The McKenna Process Company of Illinois (plaintiff appellee) is an Illinois corporation and is and has been for many years engaged in the business of reforming worn rail joint bars at its manufacturing plant in the city of Joliet. The Blatchford Corporation (defendant appellant), is an Illinois corporation and is and has been for many years engaged in the business of reforming worn rail joint bars, at its manufacturing plant in the city of Aurora, Illinois. On September 12, 1931, the McKenna Process Company of Illinois, as the owner of a large number of patents issued in name of George Langford for the process of reforming worn rail joint bars, granted an exclusive license under said patents to the Rail Joint Company of New York with power to grant sublicenses. On the same date, by a separate contract, the Rail Joint Company of New York granted a sublicense of all the Langford patents to the McKenna Process Company of Illinois, and on the same date, and by another separate contract, the Rail Joint Company of

New York granted a sublicense to the McKenna Process Company of certain patents owned by the Rail Joint Company.

During the years 1930 and 1931, the Blatchford Corporation secured contracts with various railroad companies to reform rail joint bars, and was engaged in that work at Aurora at the time it was sued in the federal court at Chicago by the Rail Joint Company of New York and the McKenna Process Company of Illinois for infringement of the patents owned by those complainants. As a result of negotiations to compromise the infringement suit, and as a complete and final settlement of that controversy, a contract of October 31, 1932, was entered into between the McKenna Process Company of Illinois and the Blatchford Corporation, with the consent of the Rail Joint Company of New York, and this last contract is the subject matter of the case at bar.

After the above contract was entered into the Blatchford Corporation continued, as before, to reform rail joint bars for the railroad companies with whom it had contracts. Some months later, early in 1933, it was agreed between the parties, that the Blatchford Corporation should make reports and pay the royalties as of December 2, 1932. From this date until December, 1935, the Blatchford Corporation continued to make the reports, prescribed by the license agreement, of all rail joint bars reformed by it under that agreement, and continued to remit for royalties thereon; at no time, however, remitting more than $1 per ton as to bars reformed for railroads with whom it had contracts existing on October 31, 1932, for $13 or less per ton. The $1 per ton royalty was not questioned in any way by the McKenna Process Company until about August 1, 1933, when the said existing contracts with railroad companies were abrogated by different contracts with the railroad companies, providing for a rate of $14.30 per ton.

All of the four "existing" contracts between the Blatchford Corporation and the railroads had called for a tonnage rate of $13, and each of them was, on or about August 1, 1933, by mutual agreement, renewed for a year at a price of $14.30. The Blatchford Corporation insists that this was merely an exercise by the railroad company of its option to renew for one year and did not take it out of the class of contracts designated as "existing" contracts and that it was not liable to the McKenna Process Company for an increase in royalties from $1 to $2. The McKenna Process Company insists that the increase in price to the railroads to an amount above $13 per ton had the effect of new and different contracts which abrogated the old "existing" contracts, and that henceforth the Blatchford Corporation was liable for a royalty of $2 per ton. This controversy is evidenced by correspondence between the parties, until the suit was started.

On October 17, 1935, the McKenna Process Company sent to the Blatchford Corporation an itemized statement of account, and asked for an early settlement, and attached a bill for $7,836.93. Payment was not made and this suit was started. The original complaint, which was later amended, was filed on December 2, 1935. The amended complaint consisted of two counts. The first count alleged facts upon which plaintiff based a prayer for injunction, which the court, by its final order of March 2, 1939, dismissed without prejudice. The second count was in assumpsit. It charged that plaintiff had performed its covenants under the contract, but that defendant has failed to pay the royalty of $2 per ton on all such bars reformed by it; that defendant has reformed as licensee under the patents, 8,583.07 tons of bars for the railroads at a price not less than $13 per ton and not under "existing contracts"; that a royalty of $2 per ton was due on that tonnage of which $1 was paid, leaving a balance of $8,583.07 due and unpaid to plaintiff; that certain

other bars had been reformed on which none of the royalty had been paid and there was $721.62 due on this tonnage making a total of $9,304.69.

A motion to dismiss the amended complaint was denied. The defendant answered that the plaintiff had failed to submit the agreement to arbitration; that the license agreement was null and void as being in restraint of trade and in violation of the laws against monopolies; that the plaintiff could not recover as it had been paid in full; and denied all other allegations of the complaint. Defendant also filed a counterclaim in which it set up that certain work had been done under the Thompson patent, which had expired December 12, 1933, and that, by mistake, defendant paid to plaintiff the sum of $3,400.97 for work done under that patent after the patent had expired; also that it had done other work not under any of the patents listed in the license agreement for which it had paid the plaintiff by mistake the sum of $9,511.95, and asked judgment against the plaintiff for these payments. Plaintiff filed a reply denying all the allegations of this counterclaim.

It was stipulated between the parties that the summary, as it appears on pp. 56–62 of the abstract, constitutes a complete and accurate description of plaintiff's Exhibits Nos. 17 to 76, inclusive; that the summary shows the invoices as numbered which were sent by the defendant to the railroads as each lot of bars reformed by defendant was shipped to the railroads, and copies of which were sent to plaintiff; also the dates of the invoices, the railroads to whom bars were shipped by the defendant, the type of the bars, the section number of the bar, the number of bars, the net weight, the price per ton charged by defendant to the railroads, and the royalty per net ton actually paid by defendant to plaintiff from December 1, 1932, up to and including October 1, 1935. It was further stipulated that the difference between the $1 per ton

royalty paid by defendant to plaintiff, and the $2 royalty claimed by plaintiff, as per plaintiff's letter of October 17, 1935, is the sum of $7,838.93 and that the amount of royalties claimed by plaintiff to be due for the months of September and October, 1935, as shown by the summary of plaintiff's exhibits 17 to 76 inclusive, is $761.89.

The case was heard before the court without a jury, who found the issues in favor of the plaintiff. At the time the court announced his findings, he was uncertain in regard to the item of interest. Later, he allowed interest on the amount found to be due the plaintiff, and entered judgment in favor of the plaintiff for the sum of $10,046.11 and assessed the costs of the suit against the defendant. It is from this judgment that the Blatchford Corporation brings the case to this court on appeal.

The appellant has assigned five reasons why the trial court erred in rendering judgment for the plaintiff, the first of which is that the court erred in rendering judgment for the plaintiff, when the evidence clearly shows that the license agreement and the conduct of the parties, was in violation of the laws of the State of Illinois, and the United States of America prohibiting restraints of trade and monopolies. The appellee strenuously contends that the license agreement does not violate these laws, either of the United States, or of the State of Illinois, and that the contract is not in restraint of trade. Both sides to the controversy have cited numerous cases, both in the United States Supreme Court and United States Federal Courts, and also in our own Supreme Court. We have examined all of the cases cited and have come to the conclusion that the law, as stated in the case of *Standard Oil Co. v. United States of America*, 283 U. S. 163, 75 L. Ed. 926, 51 Sup. Ct. 421, is applicable to the case at bar. This case, so far as we are able to ascertain, is the last expression of the Supreme Court of the

United States, relative to such matters. The Standard
Oil Company of Indiana, the Standard Oil Company of
New Jersey, and the Texas Company, each had patents
upon an oil cracking process. As early as 1913, the
Indiana Co., had developed this process, and by 1921,
had licensed 15 independent concerns to use the
process. In the meanwhile, other oil companies had
been working independently to develop a commercial
process of their own. Most prominent among these
were the three defendants in the case. Each of these
secured a great number of patents covering its crack-
ing process. Beginning in 1920, a conflict developed
among the four companies concerning the validity,
scope and ownership of issued patents. One infringe-
ment suit was begun. Cross notices of infringement
antecedent to other infringements were given; and
interferences were declared on pending applications in
the patent office. The three defendants in the suit
asserted that it was these difficulties, which led to the
procurement of the three principal agreements (which
the United States attacked), and that their sole objec-
tion was to avoid litigation and laws of infringement
of conflicting patents. Later, these three companies
licensed many other oil companies to use their crack-
ing process in making gasoline. Each of the licensees
had to pay royalties to the three main companies. It
was this agreement that the government attacked as
being in violation of the Sherman Anti-Trust Laws, as
creating a monopoly in the manufacture of gasoline.

In the present case, the McKenna Process Company
of Illinois, the original owner of the patented process
for reforming rail joint bars, and the Rail Joint Com-
pany of New York, started a suit against the Blatch-
ford Company for infringement of their patents, and
as a result of negotiations during the pendency of
this suit, the contract in question for the defendant
company to use the patented process of the plaintiff
was entered into, and the suit against the defendant

for infringement, was dismissed. The law, as stated in the *Standard Oil Co. v. United States of America, supra,* and in a great many of the other cases, is, that if this license agreement amounts to a monopoly so that a substantial part of the trade is controlled by the license agreement, then it is void, as being in restraint of trade. The Supreme Court held in the Standard Oil Company case that such an agreement was not in restraint of trade, as the evidence failed to show that there was a monopoly created by this license agreement, but the evidence did show that there were many other manufacturers of gasoline who did not use this cracking process. In the present case, we think the evidence wholly fails to show that this contract created a monopoly in the reforming of railroad bars. The evidence does show that many other people were engaged in the same work in competition with the plaintiff and the defendant, and were not using this process at all. By the contract, the plaintiff was not selling to the defendant, any rail joint bars for railroads, but was selling them the privilege of using their process in reforming and reshaping worn bars. It had nothing to do with the manufacture or sale of such bars. The work done on the bar is a service rendered to the railroads for which the former charges a stipulated amount per ton. As in the case of *Standard Oil Co. v. United States of America, supra,* for a stipulated amount, the defendants were allowed to use the process which had been developed by the plaintiff companies. It is our opinion that the contract in question does not violate the terms of the Anti-Trust Laws of the United States, or of the State of Illinois, but that the contract is valid.

The appellant contends that the trial court erred in refusing their offer of proof of the intention of the parties, in interpreting the contract. The contract is in writing, and unless the language used therein is ambiguous, oral testimony cannot be introduced to

show what the intent of the parties was, but the same must be gathered from the language of the contract itself. It seems to us that the language used in the contract is plain and not ambiguous, and that the court did not err in refusing to admit the oral evidence, to show the intent of the parties.

It is next insisted that the court erred in rendering judgment for the plaintiff and denying defendant's counterclaim, since the evidence shows clearly that the defendant did not use plaintiff's patents. It is also insisted by the appellant that the Thompson patent had expired prior to the time that the particular royalties on the bars sued for had been reformed by the defendant, and therefore there was nothing due from the defendant to the plaintiff on these bars, and hence they claim they have overpaid the plaintiff a substantial amount, and ask to have this returned to them. It is difficult for the court to ascertain, from the evidence in this case, what patents were in force and effect at the time these specific bars were reformed. There are more than 45 patents, as shown by the abstract, in which the defendant was licensed to reform bars. The learned judge of the trial court, in rendering his opinion, stated, ''There is not sufficient proof in this record, in my judgment, to show that his product was not controlled by some of the other patents, or some of the re-issues, or some of the claims in these patents that were introduced in evidence in this case.'' We think the evidence fully sustains this finding of the trial court.

The appellee insists that by the appellant's action and interpretation of the licensing contract, that they are now estopped to deny, that they were processing these bars under the licensing agreement. It is uncontradicted that the appellant rendered monthly statements to the appellee, and paid $1 per ton as royalty on the bars processed by them. These statements, and the payment of $1 per ton were made voluntarily by

the appellant, and within strict accord with the licensing contract. No question was raised as to the validity of the licensing contract, until after, or shortly before the present suit was instituted, but both parties treated the contract as a valid and existing one, the only contention being as to whether the royalty was to be $1 or $2 per ton on certain bars that had been reformed. In the case of *Strong v. Carver Cotton Gin Co.,* 197 Mass. 53, 83 N. E. 328, 14 L. R. A. (N. S.) 274, the facts are very similar to the present one. A dispute arose between the parties as to whether or not the defendants were liable to pay to the plaintiff the royalties as contracted. On p. 330 of the N. E. Rep., we find the following: "So far we have dealt with the contract when it was entirely executory. When the time came for action under it and the manufacture of a particular machine was proposed, new questions would arise. It might well be a matter of doubt, especially with the imperfect knowledge of the facts that the parties had, whether such a machine was covered by the patent. If, then, the parties agreed expressly or impliedly, or assumed by their contract, that a certain machine was covered by the patent, that would be competent evidence of the fact if the matter was doubtful and was litigated. Still further, it is competent for one to agree to pay a patentee a royalty for a license to manufacture a particular machine when he is uncertain whether it is covered by a patent or not. His payment in such a case, is for exemption from disturbance and the possibility of disturbance by the patentee. If he makes an agreement of that kind, it is no defense to a suit for royalties that the patent is invalid, or that his machine is not covered by it. He has and enjoys that which he pays for, namely, immunity from any claim under the patent. The patentee gives up that which might be valuable, namely, the right to prosecute for an infringement. So, under a contract like that between these parties, if the manu-

facturer says, I will manufacture this machine and treat it as covered by the patent, and the other party assents, he is bound by his agreement so long as he acts under it. It has been said in some cases that he is estopped from denying that what he manufactures under such an arrangement is covered by the license. *Andrews v. Landers* (C. C.), 72 Fed. 666; *Sproull v. Pratt & Whitney Co.* (C. C.), 97 Fed. 807. The same principle has also been applied to hold the defendants liable as licensees in the following cases: *Covell v. Bostwick* (C. C.), 39 Fed. 421; *Pope Mfg. Co. v. Owsley* (C. C.), 27 Fed. 100–108; *Milligan v. Lalance Co.* (C. C.), 21 Fed. 570; *Kirkpatrick v. Pope Mfg. Co.* (C. C.), 64 Fed. 369. See, also, *Eureka Co. v. Bailey Co.*, 11 Wall. (U. S.) 488, 20 L. Ed. 209; *Jones v. Van Kirk*, 2 Fish. Pat. Cas. 586, Fed. Cas. No. 7,500.

"The defendant treated the machines that it manufactured as made under the patent, and, at intervals of six months for four years, made regular returns of the sales of them and paid royalties. It also advertised them extensively as made under this patent, and marked them as patented. This was equivalent to an agreement that machines manufactured while this practice and understanding existed between the parties should be treated as covered by the contract for a license. So long as this understanding existed, the defendant would be warranted in relying upon freedom from any claim by the patentees for an infringement of the patent, and the patentees would be warranted in refraining from attempting to enforce their patent by other proceedings; and in expecting payment of the royalties."

We think the law, as stated in the *Strong* case, *supra,* is applicable to the present case. The appellant has proceeded upon the theory that they were acting under this licensing contract, and are now estopped from saying that they were not.

It is insisted that the evidence shows that there is an accord and satisfaction, and therefore the court erred in rendering judgment against the plaintiff. As before stated, the contract required that the appellant render monthly statements to the appellee of the rail joint bars reformed by them. This, the appellant did, and with each statement sent $1 per ton on the rail bars so reformed, and they now contend that the appellee, by accepting these monthly payments, accepted them in full satisfaction of all moneys that were due from the appellant to the appellee. An examination of these different statements discloses that at no time did any of them say that the check as tendered with the statement, was payment in full, and there is no evidence in the record that the appellee ever accepted them as such. When a check is inclosed with a statement of account, and there is nothing to show that it is tendered and accepted as payment in full of all demands, the acceptor is entitled to retain it and to recover for the balance due on the account. *Sargent Lumber Co. v. J. W. Wells Lumber Co.,* 168 Ill. App. 581. There must be something to inform the creditor by the act of accepting a less amount than he thinks he is entitled to, that he is making an agreement to accept payment in full. The evidence does not show that the appellee ever intended to accept $1 per ton on this account as being in full payment of the same.

The contract recites, ''Now for valuable consideration it is agreed, 1. Licensor grants to licensee right under all of said patents to make bars in accordance with the inventions of said patents for the full terms thereof with right to sell bars reformed. 2. Licensee agrees to pay following royalties: (a) Upon all bars other than Headfree type reformed during the life of this license, a royalty of $2.00 per ton 'subject only to the exception that a royalty of $1.00 per net ton shall apply where, under existing contracts with railroad

companies, the licensee has contracted to reform rail joint bars at a price of $13.00 or less per ton.' '' At the time the contract was entered into the appellant had several contracts with railroad companies to reform bars at $13 or less per ton, and it is agreed that $1 per ton had been paid on all of these contracts. Later, the price was raised to $14.30 per ton to these same companies, and it is insisted by the appellee that this was a change in the contract between the appellant and the railroad companies, and therefore, they were entitled to a royalty of $2 per ton on all such bars reformed under the new contracts. The appellant strenuously contends that these are not new contracts, but were old contracts, and that on account of the N. R. A. they were forced to pay higher wages to their employees, and therefore had to charge the railroad company more for the reformed bars, which increase the railroad companies agreed to, and did pay. It is immaterial why the appellant raised the price of these bars to the railroad companies. The contract explicitly says that where the price was more than $13 per ton, the royalty shall be $2 per ton on all bars. Regardless of why it was done, the contract price was changed from $13 to $14.30 and this is a change in the term of the contract, so that the licensor should be entitled to $2 per ton, on such bars so reformed by the licensee.

Section 10, of the licensing contract, provides that in the event a controversy arises as to the payment of royalties, the matter shall be referred to an arbitrator to be mutually agreed upon. If not possible to agree, an arbitrator's committee shall be selected and the decision of the majority of the members shall be binding upon the parties hereto. It is now insisted by the appellant that the appellee is barred from maintaining this suit, because there was a controversy between the parties, as to the amount of the royalties and the appellee, having failed to have the same arbitrated,

violated the contract, and cannot maintain the suit in question. The only Illinois authority cited by the appellant to sustain its contention, is the case of *White Eagle Laundry Co. v. Slawek,* 296 Ill. 240. An examination of the facts in this case discloses that an entirely different situation existed from that of the present case. In the Laundry Company's case, there had been a collision between the cars of the plaintiff and the defendant; suit had been started, and they then agreed to arbitrate their differences. An arbitrator was selected and heard the evidence and filed his report, finding that the defendant was guilty of negligence and that the plaintiff was guilty of contributory negligence, the negligence of both parties being the primary cause of the accident, and finding that there was no right of recovery in favor of the plaintiff. Objections were filed to this award, but the court entered judgment that the plaintiff take nothing, and that the defendant recover his costs. The court held that the parties had agreed to arbitrate their differences and actually did submit them to the arbitrator, that then both sides to the litigation were bound by the arbitrator's award, as the statute made it irrevocable. In the case of *Cocalis v. Nazlides,* 308 Ill. 152, 156, we find the following:

"Inasmuch as the arbitration of controversies avoids the formalities, delay and expense of litigation in court, the courts, speaking from an economic standpoint, have approved and recommended that method of settlement. (*Gerrish v. Ayers,* 3 Scam. 245; *Merritt v. Merritt,* 11 Ill. 565; *Haywood v. Harmon,* 17 id. 477; *Podolsky v. Raskin,* 294 id. 443; *Ballance v. Underhill, supra.*) The question, however, to be decided is not whether the courts would advise the appellant to submit his controversies with the appellee to arbitration, but whether he shall be compelled to do it because he signed an agreement that he would. The constitution has created courts for the adjustment of rights, the

settlement of controversies and the redress of grievances, with all the necessary powers to enforce their judgments and decrees, and has preserved the right of citizens to invoke their jurisdiction. Parties, generally, in dealing with each other adjust their differences without the intervention of any authority, but if they do not, they may refer any such matter to arbitration or may call upon a court to enforce alleged rights or redress alleged grievances. If there is a submission to arbitration the law has always been that there must be an existing controversy between the parties. It is essential to the very idea of an arbitration that there should have been an antecedent dispute or an existing matter of difference to be adjudicated and determined, so as to conclude the parties as to the matter in issue between them. If there is no matter in dispute there is no question for arbitration, and accordingly it was held in *Norton v. Gale,* 95 Ill. 533, where annual rent was to be ascertained by appraisers, their decision was not an arbitration because there was no matter in controversy when the leases were executed.'' This case also discusses and explains the facts and law of the *White Eagle Laundry Co. v. Slawek, supra.*

There is another reason why the appellant's contention is not tenable. The agreement to arbitrate their differences in regard to royalties was mutual, and there had been a controversy as to amount of royalties between the parties for months. The appellant insisted that he was to pay only $1 per ton for the bars they processed, and the appellee insisted that they were entitled to $2 for each ton so processed. If the appellant had desired to arbitrate this matter before the suit was started, it was just as much its duty to ask to have arbitrators appointed, as it was for the appellee to ask to have the matter arbitrated, before starting the suit. A mere agreement to submit future differences to arbitration does not oust the court of

jurisdiction to decide the matter. It is revocable, and bringing suit is a revocation of the contract. *Crilly v. Phillip Rinn Co.*, 135 Ill. App. 198.

We find no reversible error in this case, and the judgment of the trial court is hereby affirmed.

*Affirmed.*