POPE MANUF'G Co. *v.* OWSLEY. (Bill.)[1]

OWSLEY *v.* POPE MANUF'G Co. (Cross-bill.)

*(Circuit Court, N. D. Illinois. 1886.)*

1. PATENTS FOR INVENTIONS—EQUITY JURISDICTION—LICENSE—DISCOVERY.
    Equity has jurisdiction to compel a discovery of the number of patented
    articles made under a license, where the licensee neglects or refuses to make
    monthly reports as he has covenanted to do; and a covenant to make monthly
    reports is, in fact, a covenant for a monthly discovery of the work done un-
    der the license.
2. SAME—RESTRICTED LICENSE—INFRINGEMENT.
    Where a license does not purport to give an unlimited right to the use of
    the patent, but restricts the right to machines of certain descriptions, when
    licensee makes machines not in conformity to his license, but within the pat-
    ent, he not only violates his express covenant not to do so, but violates the
    patents.
3. SAME—REVOCATION OF LICENSE.
    A license provided that licensor might terminate it by notice in writing.
    He sent a postal card to licensees, reading: "Your royalty return for Feb-
    ruary has not come to hand. Failure to forward same within five days from
    March 10th subjects your license to revokement." *Held,* that this paper fell
    far short of a notice in writing of a revocation or termination of the license.
4. SAME—WHEN LICENSEE ESTOPPED TO DISPUTE VALIDITY OF PATENT.
    Licensees under patents covenanted that they would not dispute or contest
    the validity of the same, or of complainant's title thereto. *Held,* that as long
    as the licenses remain in force defendants are estopped by the terms of
    their agreements, from denying the validity of the patents in question.
5. SAME—THREATS OF SUIT—EFFECT ON LICENSE TAKEN IN CONSEQUENCE.
    The mere fact that the owner of a patent alleges an infringement, and
    threatens suit unless a settlement is made with him, cannot be held to make
    such settlement void for fraud or intimidation.

[1] Reported by Charles C. Linthicum, Esq., of the Chicago bar.

**6** SAME.

The fact that defendants feared the result upon their business of a suit for infringement of patents, and therefore settled and took a license, is no support to a charge of fraud in the procurement of the license.

**7** SAME—LICENSE UNDER EXPIRED PATENT.

Where a license was granted covering a large number of patents, including one which had already expired, but which licensor owned and licensee had infringed, and there was no proof that it was included by the licensor in bad faith, *held*, not enough to taint the transaction as fraudulent.

**8.** SAME.

The date or duration of a patent is a matter of public record of which a licensee is as much bound to take notice as the licensor.

**9.** SAME—EFFECT OF DECISION ADVERSE TO PATENT.

A license under patents is not affected by the fact that in a suit between other parties the patents have been adjudged void, where the licensee has agreed not to contest their validity.

**10.** SAME—ESTOPPEL.

Where licensee under a patent agrees not to contest its validity, nor licensor's title, he cannot urge want of patentability, nor any question save that whether his devices are covered by it.

**11.** SAME.

Where the alternative to settle a claim for infringement or litigate is fairly tendered to a party, and he chooses to settle, he cannot afterwards retreat from the settlement merely because some other party has successfully contested the validity of the patents.

**12.** SAME—CONSTRUCTION OF INSTRUMENT.

Where a license included a large number of patents, and provided that licensees should pay a stipulated royalty on all machines made by them "embodying in their construction or mode of operation the inventions and improvements shown and described in each, all, or either of said letters patent," *held*, that so long as licensees used either of the patents they were liable to pay the royalty named in the license.

In Equity.
*Coburn & Thacher,* for complainant.
*West & Bond,* for defendants.

BLODGETT, J. The original bill in this case alleged that on the sixth day of October, 1879, complainant entered into an agreement in writing with the defendants, then doing business under the firm name of the St. Nicholas Toy Company, which agreement is annexed to the bill, and made a part thereof, as Exhibit B; in which agreement it is recited that complainant "owns and controls certain letters patent of the United States for the inventions therein set forth and described, enumerating eleven patents, and that defendants "are desirous of securing license and authority to work under said patents, and make and sell the inventions therein described." Wherefore it is agreed:

"(1) The complainant licenses defendants, subject to conditions in said agreement contained, to make, use, and sell, to the full end of the term for which each of said letters patent were granted, wooden bicycles whose wheels do not exceed fifty inches, made principally of wood, embodying in their construction or mode of operation the inventions or improvements shown or described in each, all, or either of said letters patent.

"(2) The defendants agree to make full and true returns in writing to complainant, on or before the tenth day of each calendar month in each year, of all bicycles containing said improvements so manufactured by them dur-

ing the month preceding, and the name or names of any or all purchasers of the same, and to pay the royalty or license fee accruing thereon, on or before the said tenth of each of said months; and to keep full, true, and correct books of account, open at all reasonable times to the inspection of the complainant, in which shall be entered and set down all velocipedes made and sold by them; and to mark each machine sold 'Patented;' and to pay complainant as license fee or royalty upon each and every bicycle whose wheels do not exceed 42 inches in diameter, $1, and upon each one whose wheels exceed 42 inches, and do not exceed 50 inches, $2, so manufactured and sold by the defendant, containing the improvements set forth and described in said letters patent, or either of them."

Defendants also agreed that they would not make or sell any bicycles other than those having wooden wheels, and not of greater diameter than 50 inches; "nor in any manner, directly or indirectly, violate or infringe upon said letters patent, or either of them; nor dispute or contest the validity of the same, or of complainant's title thereto," and in case the defendants should violate any of the provisions contained in the said agreement on their part, the plaintiff might terminate said license by notifying the defendants in writing that their said license had been revoked. The bill then avers similar agreements or licenses made between the same parties, one bearing date July 16, 1881, two dated November 1, 1881, and one dated February 3, 1882, and enumerating different patents as owned by the complainant, and licensing the defendants to make bicycles and velocipedes of different sizes and construction, and baby carriages, with wire wheels and rubber tires; all of which licenses contain substantially the same provisions as to payment of royalties or license fees called for by each of them, the making of monthly reports, the keeping of books, the agreement of defendants not to contest or dispute the validity of the letters patent enumerated in the licenses, and the provision for the termination of licenses by the complainant in case of default by defendants, such as are contained in Exhibit B; copies of all these licenses being attached as exhibits to the bill, and made a part thereof; Exhibit B enumerating 11 patents; Exhibit C, 14 patents; Exhibit D, 13 patents; Exhibit E, 11 patents; and Exhibit G, 12 patents,—as owned and controlled by complainant, describing such patents by their official numbers, dates, and the names of the persons to whom they were respectively granted, and describing some of them as reissues. The bill then charges that defendants, acting under the said licenses, made monthly reports and paid royalties as called for by the respective instruments, up to the first of March, 1883, when they refused to pay any more royalties, refused to make any more reports, and although there is no specific or direct allegation that defendants still continued to manufacture articles on which they should report and pay royalties as provided by said licenses or agreements, yet it is indirectly so stated. It is also stated in the bill that the defendants are making and selling velocipedes and bicycles of different sizes and construction than were allowed by their license,

in violation of their covenants contained in said license or agreement that they will not make any other bicycles or velocipedes or wheels than such as are described and authorized by the licenses. The prayer of the bill is for a discovery of the number of bicycles and wheels for baby carriages made by defendants in accordance with and under the provisions of the several licenses mentioned since they have failed to make their monthly reports, as called for by said agreements; that they be decreed to make reports in writing, and to pay the license fees found due; and also for an injunction restraining the defendants from selling any velocipedes, bicycles, or wheels specified in the several licenses without affixing or stamping thereon the word "Patented;" and also that the defendants be enjoined and restrained from making or selling bicycles or other machines described in the said licenses of different construction from those which they are allowed to make and sell by virtue of their several licenses.

Defendants, by their answer, admit the making of the agreements, and the making of reports and payment of royalties up to and including the month of February, 1883, and their refusal to make such reports and pay royalties since that time. They allege, by way of defense, that the several licenses were obtained from them by fraud; that several of the patents mentioned in the licenses were null and void at the time said licenses were granted; that the machines manufactured and sold by the defendants are not covered by any of the said patents, and do not infringe the same; and that the complainant has declared the licenses forfeited; whereby the defendants claim to be released from all obligation assumed by them in said agreements or licenses. Defendants have also filed a cross-bill, in which they seek to have the agreements or licenses in question set aside on the ground that they were obtained by fraud, the fraud charged mainly consisting in the fact that one of the patents enumerated in the licenses had expired at the time the licenses were taken, and others were very nearly expired, but by stating the date of the reissue, instead of the date of the original patent, defendants were induced to believe that the said patents had a much longer time to run than they in fact had; that several of the reissued patents were void by reason of enlarged claims; and that defendants were intimidated by threats of law-suits and injunctions into taking said licenses, and making the agreements therein contained; also that the machines made by the defendants do not infringe the claims of either of said patents, when said patents are properly understood and construed by the state of the art; and, further, that two of said patents have been declared void by a court of competent jurisdiction since said agreements were made. The prayer of the cross-bill is that the agreements be set aside, and the defendants released from all obligation to observe the same, and for an injunction restraining the defendants in the cross-bill from asserting said patents as against the complainants in the cross-bill.

The original bill alleged the making of another agreement described as "Exhibit A," and another is described as "Exhibit I;" but as the proof shows that defendants were released from the payment of royalty under Exhibit A at the time the same was made; and its only purpose seems to have been for the settlement of past claims; and that Exhibit I contained a clause allowing the defendants to revoke or cancel the same, of which they availed themselves soon after this bill was filed,—it is not deemed necessary to consider them further.

Soon after the filing of the original bill, on motion of complainant, an injunction was ordered unless the defendants should file a bond in the penal sum of $12,000, conditioned for the payment of royalties, with interest and such damages as the court should find on the hearing had accrued up to the date of the order; and also that the defendants should report to the complainant each month after the date of the order the number and kind of machines made by them under the several licenses held by the defendants from the complainant, and pay into court, or to complainant, the royalties accruing after the date of such order. Defendants filed the bond called for by this order, and have reported from month to month in pursuance thereof, and no exception has been taken to the correctness of these reports.

The first, and, substantially, the only, question raised by the defendants in the original bill is that the complainant has a complete remedy at law, and therefore a court of equity has no jurisdiction. Upon this point I think the case made by the bill showing an agreement by which the defendants were to report monthly the number of machines made under their licenses, and a covenant not to make machines, except of a certain description, and not to dispute the validity of the patents mentioned in the licenses, and that the defendants had violated their agreements in all these particulars, makes a clear case for the interposition of a court of equity. The covenant to make monthly reports is, in fact, a covenant for a monthly discovery by defendants of the work done by them under the complainant's patents. The licenses do not, any of them, purport to give the defendants an unlimited use of any of the patents, but only a restricted right to make machines of certain sizes and descriptions; so that when defendants made machines not in conformity to the licenses, they violated, not only their express covenant not to do so, but also the complainant's patents, or some of them, covering such machines.

As to the allegation in the answers that the licenses had been forfeited by the complainant before the commencement of these suits, and the defendants are thereby relieved from the obligation resting upon them therefor, it is sufficient to say that by the terms of the licenses complainant was empowered to terminate them by "notifying defendants in writing that their said licenses had been revoked." The proof in the case fails to show that any such notice was ever given by the complainants. The only element of proof bearing upon

this question is a postal card written by one of the officers of complainant to defendants, dated March 13, 1883, reading as follows: "Your royalty return for February has not come to hand. Failure to forward same within five days from March 10th subjects your license to revokement." This paper falls far short of a notice in writing of a revocation or termination of the licenses, and was evidently written for the purpose of cautioning defendants in regard to the danger they incurred by neglecting to make their monthly reports. I think there can be no doubt that if complainant had instituted any judicial proceeding upon the ground that it had revoked this license, and defendants had resisted such claim, any court would have held that the notice in question was not a notice of revokement. This feature of the defense, therefore, I think wholly fails for want of proof.

By the terms of their agreements defendants are estopped, as it seems to me, from denying the validity of the letters patents in question, and cannot be heard to say that the patents were void as long as these licenses remain in force.

This brings me to the consideration of the allegation contained in the cross-bill, as to the procurement by the complainant of these licenses by fraud. The proof as to these allegations of fraud is, in substance, that the complainant, about June, 1879, sent to defendants a printed circular stating that it was the owner of certain patents, giving a list of them, and describing them by the official numbers, dates, and names of the patentees, and stating that—

"The complainants had been advised by eminent counsel that said patents cover broadly the application of a foot-crank to the front axle of a bicycle or velocipede, and the application of such a foot-crank for the entire propulsion of the front axle of a bicycle or velocipede having only one front wheel and handle to guide the same. We hereby give notice that we shall proceed against any and all parties who infringe either of said letters patent, or who, without authority or license from us, make, use, or sell any velocipedes or bicycles constructed substantially like either of the improvements set forth and described in said letters patent; that suits have already been brought in the several circuit courts of the United States against infringers; and, in each case, the said patents have been sustained, and the infringing parties have recognized the validity of said patents, and, in some cases, have taken out licenses and paid royalty, and, in others, have stopped the manufacture of the same."

On July 28, 1879, complainant wrote defendants a letter as follows:

"We desire to call your attention to the fact that you are infringing our letters patent as per inclosed printed circular. We do not suppose that you intended to willfully disregard our rights, but, rather, from want of knowledge that we had a valid claim. Should you desire to continue to work under our patents, we think we can agree upon a satisfactory settlement for past damages, and grant you a license for future use."

On September 8, 1879, complainant's attorneys wrote defendants as follows:

"We are instructed by our clients, the Pope Manufacturing Company, to inform you that unless immediate settlement is made for the infringement of velocipede patents owned by them suit will be commenced against you. The

inclosed lists will inform you of the patents referred to. We are authorized to make settlement with you, and give you a license, if you desire to do so, without litigation, on terms which you can learn by calling at our office. Unless settlement is made within ten days from the date hereof we shall proceed to commence suit against you for infringement at once. We think, however, the terms we are authorized to propose to you are such you will have no hesitation in settling."

The proof shows that the list of patents included in both these letters was the same as that in the June circular. On October 6, 1879, the "License B" was taken by defendants, and a full settlement made of the matters called for by the license, Exhibit A.

It is now urged that as reissued patent No. 3,319 had expired on August 12, 1879, and because several of the other patents had been reissued with extended claims, and under the recent rulings of the supreme court might have been successfully resisted, therefore the whole transaction is fraudulent and void, not only as to the agreement of October 6, 1879, but those subsequently made in July, 1881, November, 1881, and February, 1882. There is no pretense or proof that the complainant did not own these patents at the time the circular of June, 1879, was sent out. The patents themselves were a matter of public record of which the defendants, as well as the entire public, were bound to take notice. The circular gave the defendants full and explicit information as to the claims of the complainant to those patents, and they had from June to October in which to investigate and determine for themselves as to the alleged infringement and the validity of the several patents. The mere fact that the owner of a patent alleges an infringement, and threatens suit unless a settlement is made with him, cannot be held to make such settlement void for fraud or intimidation. These parties stood in no relation of confidence which entitled the defendants to accept the statement of complainant upon the mixed questions of law and fact in regard to the validity and scope of its patents. The parties were dealing at arms-length. The defendants were given their choice between accepting the terms offered by the complainant and a lawsuit. They had time enough allowed them for investigation and reflection. The fact that they feared the result of litigation upon their business, and therefore settled, is no support of the charge of fraud. Any infringer could escape his settlements and liability for a patent if such a defense were admissible. There is no proof whatever that the complainant, or its officers, acted in bad faith. The mere fact that the Smith patent, No. 3,319, had actually expired when the settlement was effected, although it was in force when negotiations commenced, does not, as it seems to me, taint the transaction as fraudulent. In the first place, if it was a valid patent, and the defendants had used it, they were liable to damages up to August 12, 1879, when it expired. In the second place, the patent was in force when the circular was sent out, and as the proof shows the complainant had previously issued quite a number of licenses to others, undoubtedly the

blank agreement was prepared while the patent was in force, and by mere inadvertence this patent was not crossed off the list when the license was issued. And, finally the date or the duration of this patent was a matter of public record, which the defendants were as much bound to know as the complainant or its officers. No attempt at concealment seems to have been made which can be claimed to be a fraud.

It is further urged that this "dead patent," as it is called, was the principal and broad patent controlling the use of important elements in the construction of velocipedes, and that the opinion of "eminent counsel" referred to in the circular was based on this patent alone. While there is no proof in the record as to which of the 13 patents described in this circular was considered by the counsel who gave the opinion referred to, it is a sufficient answer to this suggestion that the patent undoubtedly was in force and properly considered when the opinion was given; and if it had expired before the defendants closed their treaty with the complainant, the defendants were as much bound to know it as the complainant. If the complainant had demanded instant settlement without time to examine or take the advice of counsel as to the scope or validity of the patents in question, or the opinion of experts as to the fact of infringement, there would be much more moral force in this line of argument; but the matter was not pressed with any undue or unconscionable haste. The time, from June to October, which was allowed to defendants to examine the entire field seems to me to have been liberal and sufficient.

It is further urged that two of the reissued patents were held void by the learned circuit court judge of the Sixth Circuit, (*Pope Manuf'g Co.* v. *Marqua,* 15 Fed. Rep. 400;) but this decision was rendered more than a year after the last license now in question was made, and after the supreme court of the United States had, in *Miller* v. *Bridgeport Brass Co.,* 104 U. S. 350, taken a radical departure from the rule formerly held by that court as to the validity of the reissue. At the time the first license was taken, the general rule followed by the courts, and acted upon by the public, in reference to reissued patents, was that a reissue taken at any time for expanded and enlarged claims was valid if the foundation of such claims could be found in the specifications, or even the specifications aided by the drawings; and, with the law thus expounded, it would certainly be harsh to charge the holder of a reissued patent with fraud for asserting its validity, and claiming damages for its infringement. The *Bridgeport Brass Co. Case* had been decided by the supreme court when the later licenses were taken, and the defendants had as many facilities as the complainant for determining whether this patent came within the rule declared in that case.

It is urged, however, that the decision of the circuit court of the Southern district of Ohio that these two patents are void, amounts to an eviction, and, as I understand the argument of the learned coun-

sel for defendants, invalidates all the agreements for licenses in which this patent was included with the others. I cannot agree with the learned counsel as to this conclusion. In the first place, that adjudication is binding only on the parties to that suit, and does not affect the relation between the parties to this contract; and, secondly, the licenses in question included a large number of patents, and provided that defendants should pay a stipulated royalty on all machines made by them "embodying in their construction or mode of operation the inventions and improvements shown and described in each, all, or either of said 'letters patent.'" My construction of this clause of the agreement is that so long as the defendants used all or either of these patents, while the patents remained in force, they were liable to pay royalty according to their contract; but when the patents expired by lapse of time, so that the machines described in one or more of the licenses could not be made without embodying the construction or mode of operation shown in any of the patents covered by the licenses, the obligation to pay royalty under such licenses ceased, on the well-accepted principle that the license terminates with the patent. But these patents are not, in my opinion, "dead," as between these parties, merely because the judge in another circuit has held them void in some suit before him between different parties. By taking the licenses, these defendants waived and abandoned their right to contest the validity of these patents, or any of them, and agreed to pay the stipulated license fees; and merely because some one else has successfully contested the validity of one or more of these patents the defendants are not relieved from their obligations. The alternative to settle or litigate seems to have been fairly tendered them, and they chose to settle, and cannot now retreat from the settlement they made.

Much time was devoted by the learned counsel for defendants in his brief and argument to the discussion of the effect of the prior art in limiting the scope of the claims of these patents, and even urging a want of patentability in the devices covered by some of them for want of novelty. These questions, it seems to me, are all foreclosed. By the defendants taking the licenses they admit the validity of the patents, and the only question left open for them is whether the machines made by them are within the terms of the claims in the patents. They have waived all questions of limiting or escaping the claims by the prior art by their agreement embodied in the license; but if they have not made this waiver by their license, they have done so by their reports made in pursuance of the second clause of the licenses, as this clause required them to report monthly "all machines containing said improvements," and by making such reports they have admitted that the machines herein mentioned contain said improvements.

Without further discussion of the testimony of the defendants in support of their answer and cross-bill, I will say that I do not think

the ground taken by the defendants for annulling these licenses is supported by the proof, or sanctioned by the rules governing the relations of the parties; nor do I think that the proof shows that the complainant has ever canceled, or intended to cancel or terminate, these licenses, nor the provisions which they respectively contain.

Upon the question whether the defendants have manufactured machines prohibited by their agreement, for which the complainant should have damages awarded, the proof is not satisfactory as the record now stands, and a reference may, therefore, be had to ascertain what machines the defendants have so made in violation of their agreements, and which are now covered by the complainant's patents yet in force, or which were yet in force after the making of said agreements, and before the patents expired, if they have expired.

I am not advised as to whether the defendants have paid complainant the amounts shown and called for in their monthly reports made under the order of court entered January 21, 1884, or whether they have paid the amounts so reported into court or not.