**AUTOMATIC RADIO MFG. CO., Inc. v.
HAZELTINE RESEARCH, Inc.**

No. 4331.

United States Court of Appeals
First Circuit.

Argued Dec. 8, 1948.

Decided Aug. 22, 1949.

WOODBURY, Circuit Judge, dissenting.

Floyd H. Crews, New York City (George K. Woodworth, Boston, Mass., and Darby & Darby, New York City, with him on the brief), for appellant.

Laurence B. Dodds, New York City (Richard F. Walker and Roberts, Cushman & Grover, of Boston, Mass., with him on the brief), for appellee.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and SWEENEY, District Judge.

MAGRUDER, Chief Judge.

This is a suit for royalties alleged to be due under a patent license agreement between the defendant, Automatic Radio Manufacturing Company, Inc., a Massachusetts corporation (hereinafter called Automatic), and the plaintiff's assignor, Hazeltine Corporation, a Delaware corporation. Plaintiff Hazeltine Research, Inc., is an Illinois corporation organized as a wholly owned subsidiary of Hazeltine Corporation. Hazeltine Electronics Corporation, another wholly owned subsidiary of Hazeltine Corporation, conducts the research program about to be mentioned. We shall refer to these corporations collectively as Hazeltine.

For many years Hazeltine has engaged in a program of radio research, as a result of which it has developed many patented inventions. Other patents have been acquired by it through various business arrangements. At the time of this suit, Hazeltine owned, or had the right to grant licenses under, five hundred and more patents and approximately two hundred patent applications, chiefly pertaining to radio and television. As one of the largest licensors in the radio field, it has granted non-exclusive licenses to radio manufacturers, permitting them to use any or all of Hazeltine's patents, in return for a royalty payment of a fixed percentage of gross sales of various types of radio equipment.

Automatic first became a licensee of Hazeltine in 1935. It defaulted on its royalty obligations under the first two agreements with Hazeltine. However, in each instance a settlement was reached, and the relationship continued. The present contract between the parties became effective September 1, 1942, to run ten years, subject to an option of earlier termination by the licensor upon the happening of certain specified events. Automatic was given a non-transferable, non-exclusive license, under a schedule of enumerated patents and all other patents with respect to which Hazeltine should acquire the right to grant licenses during the period of the agreement. The license authorized Automatic to utilize such patents in the manufacture and sale of certain described radio, phonographic, and other equipment, "limited to use in homes, use for educational purposes and private non-commercial use". Automatic agreed to pay royalties expressed in terms of a specified percentage of the selling price of each piece of the enumerated types of equipment manufactured and sold by the licensee, whether or not any of such patents were actually used in the manufacture of the particular apparatus. In any case, the agreement called for a minimum royalty payment of $10,000 per year.

The contract, in Article VI further provided—and appellant makes much of this—that the licensee "agrees to mark all licensed apparatus manufactured and sold by Licensee hereunder, in readily legible form, with the statement 'Licensed by Hazeltine Corporation only for use in homes, for educational purposes, and for private, non-commercial use, under one or more of the following patents and under pending applications:' followed by the word 'Patent' and the numbers of the patents which are, in the opinion of Licensor, involved in apparatus of the types licensed hereunder manufactured by one or more licensees of Licensor. The marking required by this section shall be affixed to said licensed apparatus by attaching plates bearing the required marking or by affixing said marking on said apparatus in some other form equally permanent and apparatus not bearing such marking is not licensed."

It was found by the district court that the contract was executed in New York, and that at least part of the performance thereunder was due in New York. The concluding article of the contract provided that it was to be "governed by and interpreted in accordance with the laws of the State of New York."

Because of wartime restrictions on the production of radio sets for private use, Hazeltine waived demand for payment of the minimum annual royalties from September, 1942, through August 30, 1945. Upon refusal of Automatic to pay royalties thereafter, Hazeltine filed its complaint in the present case on April 9, 1947. Plaintiff prayed for a judgment that Automatic pay to Hazeltine the minimum sum due under the contract for the year ending August 31, 1946, with interest; that an accounting

be had and that the further sums due be determined and decreed to be paid to the plaintiff with interest; "that defendant render to the plaintiff the statements required by said agreement throughout the continuance in force of said agreement"; that defendant pay plaintiff's costs herein; and that plaintiff have such other and further relief as may be just.

After Automatic's answer was filed, both parties filed motions for summary judgment and submitted supporting affidavits. A hearing was held on the motions, and the district court concluded that the case was one appropriate for the application of summary judgment procedure since there was "no genuine issue as to any material fact". Hazeltine's motion was granted and Automatic's motion denied. D.C., 77 F.Supp. 493.

On June 21, 1948, an "Interlocutory Judgment" was entered, in which it was adjudged and decreed as follows:

(1) That the license agreement between the parties dated as of September 1, 1942 "is good and valid at law and in full force and effect."

(2) That plaintiff recover from defendant as minimum royalty under the license agreement for the year ending August 31, 1946 the sum of $10,000 with interest, "and that execution may issue therefor."

(3) That plaintiff recover such further sums as are due from the defendant at the date of this judgment under said license agreement, and that the case be referred to a Master to take and state an account thereof.

(4) That "a permanent injunction issue out of and under the seal of this Court directed to defendant, its officers and agents, enjoining and restraining them and each of them throughout the continuance in force of said license agreement from breaching such provisions of Articles IV and V thereof as relate to defendant's obligation to plaintiff to pay royalties and to keep records and render statements from which the proper amounts of such royalty payments may be determined."

This court has jurisdiction to entertain the present appeal from such judgment, pursuant to provisions of the Judicial Code now found in 28 U.S.C.A. §§ 1291, 1292(1), and 1294(1). Counsel for both parties approved the judgment "as to form," and no question is presented here as to the scope of the injunction.

Automatic raised, and the district court considered, numerous defenses. In examining the judgment of the district court, we confine our attention only to those matters presented in this appeal. In its brief, Automatic has enveloped the case in an atmosphere of overreaching and chicanery hardly warranted on the record. A lengthy affidavit executed by one of counsel for Automatic, and filed by Automatic in support of its motion for summary judgment, contains many sweeping claims and charges, but the affidavit was made for the most part "on information and belief", and not on personal knowledge, as required by Rule 56 (e), Federal Rules of Civil Procedure, 28 U.S.C.A.

## I. Patent Misuse

Appellant has advanced a variety of defenses to sustain the proposition that Hazeltine has so misused the monopoly of its patent grants as to have disentitled itself to any relief under the present complaint.

*Restrictive Use Notices.*—Automatic argues that the requirement in the license agreement that licensed apparatus be marked with a "restrictive use" notice, as above stated, constitutes such a misuse of the patent as to render the agreement unenforceable. This contention must be rejected on the authority of General Talking Pictures Corp. v. Western Elec. Co., 1938, 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273, and upon rehearing, 1938, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81. In that case a non-exclusive license "was expressly confined to the right to manufacture and sell the patented amplifiers for radio amateur reception, radio experimental reception, and home broadcast reception." 304 U.S. at page 180, 58 S.Ct. at page 852, 82 L.Ed. 1273. The agreement required the licensee to affix to all amplifiers sold under the license a notice stating that the apparatus was licensed only for the aforesaid uses. Amplifiers with such notices attached were sold by the li-

censee to a purchaser who intended to and did put them to use in theaters as part of talking picture equipment. At the time of order, manufacture and sale, both the licensee and the purchaser knew of the purchaser's intended commercial use, and the purchaser knew that the license did not authorize the licensee to make and sell amplifiers for that use. Speaking through Mr. Justice Brandeis, the Supreme Court on rehearing reaffirmed its earlier view that the purchaser was accountable as an infringer. "That a restrictive license is legal seems clear. * * * The practice of granting licenses for a restricted use is an old one, see Rubber Company v. Goodyear, 9 Wall. 788, 799, 800, 19 L.Ed. 566; Gamewell Fire-Alarm Telegraph Co. v. Brooklyn, C.C., 14 F. 255. So far as appears, its legality has never been questioned. * * * As the restriction was legal and the amplifiers were made and sold outside the scope of the license, the effect is precisely the same as if no license whatsoever had been granted to [the licensee]. And as [the purchaser] knew the facts, it is in no better position than if it had manufactured the amplifiers itself without a license. It is liable because it has used the invention without license to do so." 305 U.S. at page 127, 59 S.Ct. at page 117, 83 L.Ed. 81. Consequently, the Court continued, there was "no occasion to consider what the rights of the parties would have been if the amplifier had been manufactured 'under the patent' and 'had passed into the hands of a purchaser in the ordinary channels of trade.' Nor have we occasion to consider the effect of a 'licensee's notice' which purports to restrict the use of articles lawfully sold."

We must conclude from the decision in the General Talking Pictures case that a license agreement is not necessarily invalid because the licensee is granted a restricted right to make and vend a patented apparatus for use limited to a particular, described field, and is required by the agreement to affix to the licensed apparatus a notice of such restricted use. There may be circumstances under which a notice of restricted use would be inoperative and unenforceable as against subsequent purchasers, but that problem is not presented in the case at bar. And it is to be noted that the judgment from which this appeal is taken does not even command Automatic, the licensee, to comply with the term of the agreement requiring it to attach the restrictive use notices to the licensed apparatus sold by it.

General Talking Pictures Corp. v. Western Elec. Co. has not been overruled by the Supreme Court. Appellant contends that the case was wrongly decided, and that the authority of the case has been more or less undermined by subsequent decisions of the Supreme Court on related subject matters. From our examination of the later cases we are not satisfied that this is so; at any rate, we decline to speculate on whether the case would now be followed by the Supreme Court. If the case is to be overruled, that must be done by the Supreme Court. Meanwhile, it is our duty to follow it.

In fact, it appears that none of the radio apparatus made and sold by Automatic has been marked with the restrictive use notice required by Article VI; in other words, Automatic has consistently ignored this provision of the agreement. Automatic makes the curious suggestion that its own breach of this term of the contract affords an independent ground for relieving it of the obligation to pay the stipulated percentage royalties. The argument is based upon the provision of Article VI that apparatus not bearing the restrictive use notice "is not licensed"; and therefore, Automatic argues, since "no licensed apparatus for which royalties are due under the contract has ever been made or sold", the district court erred in requiring an accounting of percentage royalties. Under the foregoing circumstances, no doubt Hazeltine would have had an election to proceed against Automatic on the theory of infringement. But the above contract provisions are for the benefit of the licensor, who may choose to waive them. Notwithstanding the failure of Automatic to attach the restrictive use notices, Hazeltine is entitled to insist upon the performance by Automatic of its contract obligation under Article IV to pay as royalties a percentage

of the selling price of each complete apparatus of the types listed in Article III, Section 2, "sold by Licensee during continuance of this license".

 *Royalty Payments.*—It has been pointed out above that the license agreement gave Automatic the right to make use of any of Hazeltine's patents, and required Automatic to pay royalties measured by a percentage of the selling price of all radio apparatus of specified types manufactured and sold by Automatic, whether or not any particular apparatus in fact utilized any of the inventions of the Hazeltine patents, with a minimum royalty payment of $10,-000 a year. There is no valid objection to this sort of agreement; the parties are free to bargain as to the basis upon which the royalties are to be computed. H-P-M Development Corp. v. Watson-Stillman Co., D.C.N.J., 1947, 71 F.Supp. 906. Cf. Pyrene Mfg. Co. v. Urquhart, D.C.E.D.Pa., 1946, 69 F.Supp. 555, 560; American Optical Co. v. New Jersey Optical Co., D.C., Mass., 1944, 58 F.Supp. 601, 606; Ohio Citizens Trust Co. v. Air-Way Elec. Appliance Corp., D.C.N.D.Ohio, 1944, 56 F.Supp. 1010, 1012. As stated in one of Hazeltine's affidavits, this type of royalty clause was originally adopted "for convenience of accounting". The court below stated: "This is a convenient mode of operation designed by the parties to avoid the necessity of determining whether each type of defendant's product embodies any of the hundreds of patents which plaintiff controls." D.C., 77 F.Supp. at page 496. Certainly a licensee, in consideration of the grant of the right to use a licensor's patent, may lawfully promise to pay the licensor a fixed sum per year during the life of the agreement; and this promise would not become unenforceable merely because the licensee in a particular year, happened not to utilize the invention. If this is so, it would be no more against public policy to stipulate for a variable consideration by way of royalty for the right to use the patent, whether such consideration were expressed in terms of a percentage of the net profits of the licensee's business, or (as here) in terms of a percentage of the selling price of certain apparatus manufactured and sold by

the licensee. Depending on the circumstances, such a percentage royalty might well be a lesser charge upon the licensee's business than a stipulation for payment of a flat sum yearly.

A different problem would be presented if the license agreement had provided that, in part consideration for the right to make use of Hazeltin's patents, Automatic agreed not to compete in the commercial field in the manufacture and sale of any radio apparatus of the types enumerated, even though such apparatus did not embody any of the inventions covered by Hazeltine's patents. Such an agreement might be unenforceable as constituting an unlawful attempt to extend the monopoly of licensor's patents beyond the limits of the patent grants. But as we read the license agreement in the case at bar, Automatic would not break the agreement by manufacturing and selling for unrestricted use radio apparatus which in fact does not embody any of the inventions covered by Hazeltine's patents. This is true notwithstanding the fact that Automatic, in making such a sale, would be required by Article IV, Section 1, of the agreement to pay to Hazeltine the stipulated percentage of the selling price as royalty for the *right* to utilize the patents covered by the license agreement.

 *Duress.*—Automatic's brief states that its affidavits "assert the license was signed only in fear of disastrous litigation. If it was, in fact, coerced into taking a license under invalid patents having no application to any radio set made today, the patents were obviously misused." Not all economic pressure constitutes "duress" rendering a contract voidable. The defense of duress is discussed in 5 Williston, Contracts, § 1606, Rev. Ed., 1937, where it is pointed out that the pressure exerted must be wrongful; that a threat to resort to civil litigation is not such duress as to justify rescission of a transaction induced thereby even though there is no legal right to enforce the claim, provided the threat is made in good faith, that is, in the belief that a possible cause of action exists. Neither Automatic's answer nor its amended answer set up duress as a defense. Not-

withstanding the statement in Automatic's brief, the record in fact contains no specific allegation that Automatic was improperly coerced into executing the license agreement now in suit. There is a statement in Automatic's counter motion for summary judgment, as one of the asserted grounds for dismissal of the complaint, that Hazeltine has misused its patents by suing and threatening to sue, and otherwise harassing customers of radio manufacturers refusing to take a license under its patents "and coercing radio manufacturers to take licenses under its patents by threats of repeated, expensive law suits"; and a similar statement is made in one of the supporting affidavits.[1] Even if—as would hardly be justified—we take this allegation to imply that Hazeltine improperly coerced other radio manufacturers to enter into license agreements by threats of patent infringement suits which Hazeltine knew to be unfounded, such wrongful conduct in respect to third persons would constitute no defense to Automatic in the present suit. A promisee's cause of action on one contract cannot be defeated merely by a showing that the promisee had improperly coerced third parties into entering into similar contracts with him. See 6 Williston, Contracts, § 1752, Rev. Ed. 1938; 2 Restatement, Contracts § 597 (1932). This generally accepted rule of law should not, in our view, be discarded by an extension of the decision in Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, which dealt with quite a different set of facts not involving the assertion of third-party defenses by a defendant sued for breach of contract.

 *Monopoly.*—Automatic has claimed that Hazeltine's alleged monopolistic practices should preclude its recovery here. Its answer alleged as a defense that Hazeltine "in an illegal endeavor to eliminate all competition and secure an unlawful monopoly in violation of the antitrust laws of the United States, acquired the approximately 425 United States letters patent and the approximately 120 applications for United States letters patent * * * from its employees" (and from other corporations and persons). From Automatic's somewhat nebulous generalizations, it is difficult to ascertain the precise nature of its argument on this score, though it does concede that the mere accumulation of patents, however great in number, is not illegal per se. Cf. Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 1947, 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563. As one of the grounds in support of its counter motion for summary judgment, Automatic asserted that Hazeltine has misused its patents by "refusing to grant a license under any one or more of its patents to anyone who refuses to take a license under all." The only factual support we have been able to find for this allegation is a statement in one of Automatic's affidavits, made by the affiant on information and belief, not as a matter of personal knowledge. It is indeed nowhere alleged that Automatic had sought and been refused a license covering less than all of Hazeltine's patents. This particular contention has not been pressed on appeal as a separate ground of defense.

 In most other respects, it appears that the defense of monopolistic practices is merely the assembling under a different heading of matters we have already considered. The district court correctly ruled that, even assuming arguendo that Hazeltine was engaged in an unlawful scheme to maintain a monopoly, the license contract in suit was not an integral part of it; that the license agreement, being itself a valid contract, will not be rendered unenforceable by collateral activities of the plaintiff in violation of the anti-trust laws. 2 Restatement, Contracts § 519 (1932); 5 Williston, Contracts § 1661, Rev. Ed., 1937; 2 Walker, Patents § 409, Deller Ed., 1937. See also Bruce's Juices, Inc., v. American Can Co., 1947, 330 U.S. 743, 754, 755–756, 67 S.Ct. 1015, 91 L.Ed. 1219. Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, is no au-

---

[1] It appears that among the other licensees of Hazeltine are General Electric Corporation, Westinghouse Electric Corporation, and Radio Corporation of America. R.C.A. paid approximately one million dollars in royalties to Hazeltine during the years 1937–1947.

thority for the proposition that a contract action for patent royalties may be bogged down by the defendant into a complicated and protracted trial of asserted collateral infractions of the anti-trust laws. And see Radio Corporation of America v. Majestic Distributors, D.C.Conn., 1931, 53 F.2d 641, 642–643, and cases cited.

## II. Alleged Invalidity of Hazeltine's Patents

■ Until recently, it had generally been thought to be settled law that, in a suit for patent royalties under a license agreement, the licensee was estopped from challenging the validity of the licensor's patent. United States v. Harvey Steel Co., 1905, 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492; 2 Walker, Patents, § 383, Deller Ed., 1937. Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 1947, 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374, and MacGregor v. Westinghouse Elec. & Mfg. Co., 1947, 329 U.S. 402, 67 S.Ct. 421, 91 L.Ed. 380, established that this proposition can no longer be received without qualification. In each of those cases the licensee had agreed to sell the licensed products at prices fixed by the licensor. "Such a restriction on the price of articles entering interstate commerce is a violation of the Sherman Act save only as it is within the protection of a lawfully granted patent monopoly." Sola Elec. Co. v. Jefferson Elec. Co., 1942, 317 U.S. 173, 175, 63 S.Ct. 172, 173, 87 L.Ed. 165. The Court, in the Katzinger and Mac-Gregor cases, deemed the price-fixing undertaking to be an inseparable part of the "integrated consideration for the license grant"; and in these circumstances concluded that the public interest in "freedom from invalid patents and from restraints of trade" 329 U.S. at page 401, 67 S.Ct. at page 420, 91 L.Ed. 380, would best be served by allowing the licensee to set up the invalidity of the patent in defense to a suit for royalties. It confined its decision to the set of facts before it, and pointedly declined to lay down the broader rule that a licensee may in all cases defend on the ground of invalidity of the patent even when no price-fixing stipulation was involved in the license contract. 329 U.S. at page 399, 67

S.Ct. 416, 91 L.Ed. 374. As to that, the Court reserved judgment.

Until we receive further light and leading from the Supreme Court, we are disinclined to extend the holdings in the Katzinger and MacGregor cases so as to throw into the discard altogether the long line of earlier cases disallowing a licensee to challenge the validity of the licensor's patent. It is not uncommon for the parties to a patent infringement suit, in which there is a genuine issue as to the validity of the patent, to make a settlement of the litigation by an agreement under which the patentee gives a license to the alleged infringer in consideration of the payment of a stipulated royalty. Indeed, the license agreement in suit seems to have been by way of settlement of earlier litigation between the parties. It is not apparent to us that the public interest would be served by rendering such common-sense business settlements nugatory, which would be the result of a ruling that the licensee could reopen the issue of validity when sued for the stipulated royalty.

■ In the case at bar, where a large number of patents were covered by a single license agreement containing no price-fixing stipulation, the result would be particularly awkward if it were held that the licensee may defend by putting in issue the validity of all these patents. Although Automatic's motion for summary judgment and its supporting affidavit make the general statement that none of Hazeltine's patents covered by the license are valid, no concrete attempt was made to buttress these assertions, and the district court concluded: "Furthermore, the defendant does not purport to contest the validity of all plaintiff's patents." D.C., 77 F.Supp. at page 497. We ourselves have been unable to find from the record that Automatic seriously attempted to raise a "genuine issue" as to the validity of all the licensed patents. If the holding of the Katzinger and MacGregor cases were extended to the present situation, because of the restrictive use provision or otherwise, would the licensee, in order to make out its defense, have to establish that each and every one of the li-

censed patents is invalid? Or could the licensee maintain, in view of the fact that the stipulated royalties are payable whether or not any particular apparatus manufactured and sold by the licensee embodies any of the inventions covered by the patents, that the royalty agreement as an inseparable entirety becomes unenforceable if it can be shown that any one of the 500 licensed patents is invalid? Or, as a third alternative, would the licensee have to show that a substantial number of patents, or the more important patents constituting the "substance" of the agreement, were invalid? If we are wrong in our conclusion that the licensee here cannot challenge the validity of the patents, then we confess we would be at a loss to know how to instruct the district court to proceed with the case upon remand. Whichever of the three alternatives above suggested were followed, it seems to us the resulting situation would be a mess, and the district court would likely be subjected to a well-nigh intolerable burden.

### III. Eviction

Questions of direct attack upon validity aside, Automatic relies on the defense of eviction which, as we understand its attempted application here, is in substance a defense of failure of consideration. The argument is based upon these circumstances: At various times in the past, Hazeltine brought infringement suits against third parties based on one or more of eight of the patents licensed under the agreement in suit. Only one of these eight patents was ever passed on by the Supreme Court, and its judgment of invalidity did not extend to all of the claims of this patent. Of the other seven patents, lower courts held all of the claims of two invalid, and some of the claims of the remaining five were also held invalid. Two additional patents sued on by Hazeltine were held by a lower court not to have been infringed. Some of these patents were litigated before the effective date of the agreement in suit and some after. The record is clear that Hazeltine informed Automatic of the aforesaid Supreme Court judgment of invalidity before the present license agreement was execut-

ed, but Automatic alleges that it was then unaware of the judgments of invalidity or non-infringement of the other patents litigated before that date.

Although Automatic did not in this court rely on a defense of fraud or misrepresentation, Automatic does claim that the aforesaid ten patents litigated adversely to Hazeltine were the ones in which Automatic had been chiefly interested; that the judgments against Hazeltine demonstrate the worthlessness of these patents, and that consequently there has been a failure of consideration relieving Automatic of its obligations under the license agreement.

■■■ It may be that the defense of eviction or failure of consideration raises a question of local law. The court below correctly ruled that, in so far as local law is controlling, the local law properly applicable under the circumstances of this case is that of the State of New York. See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Adamowski v. Curtiss-Wright Flying Service, Inc., 1938, 300 Mass. 281, 15 N.E.2d 467; Restatement, Conflict of Laws, §§ 332, 358, Comment b (1934).

In our opinion the defense of eviction is insupportable on several grounds.

The mere fact that Automatic may have regarded ten particular patents, out of the more than 700 patents and patent applications covered by the license agreement, as the most important ones licensed, in no sense means that both parties regarded those patents as the "substance" of the agreement and contracted accordingly. The record offers no significant suggestion that such was the case, and the district court concluded that Automatic "has not made any serious effort to show eviction here and could not show it", and that Automatic got "by the contract, what it bargained for, namely, the right to use whatever patents are available for use in plaintiff's large collection." D.C., 77 F.Supp. at 497.

■■■ Even if Automatic had properly presented this defense, we do not think it could be sustained where a non-exclusive license is concerned. Without attempting a

full discussion of the doctrine of eviction,[2] we may assume for present purposes that, where an exclusive license is granted and the patent is held invalid, even by a lower court, in a suit between the patentee-licensor and a third party, the licensee may successfully claim an eviction. An exclusive license agreement may be said to presuppose a grant to the licensee of a complete monopoly; if the patent is not upheld in even one suit against an infringer, the desired monopoly is pro tanto destroyed, and there may be said to be a failure of consideration. See Schutte & Koerting Co. v. Wheeler Condenser & Engineering Co., D.C.E.D.Pa.1924, 295 F. 158; 1 Williston, Contracts, § 137, Rev.Ed., 1936. But where the license, as here, is non-exclusive, this argument is inapplicable.

To hold that a non-exclusive licensee may base a defense of eviction on lower court judgments of invalidity in suits between the patentee-licensor and third parties would seem inconsistent with the principles recognized in Triplett v. Lowell, 1936, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949. There it was held that, even though in an earlier infringement suit against a third party some claims of a patent had been held invalid and the patentee had failed to disclaim them, the patentee might still maintain a suit against another alleged infringer for infringement of those same claims as well as other claims. The Supreme Court pointed out that many times it had upheld claims previously held invalid in litigation that had not reached the Supreme Court; that if in the second suit the previously invalidated claims were upheld, no question of failure to disclaim would be presented; but if these claims were again invalidated, the court would be faced with the question whether recovery on other claims should be barred by reason of the failure to disclaim the invalidated claims. We think in the present suit against Automatic on the non-exclusive license agreement, it would be anomalous to give greater effect to a lower court's judgment of invalidity in an infringement suit against a third party than would be given to such a judgment if Automatic had not been a li-

censee and had been sued as an infringer. In short, a holding by one lower court that a patent is invalid is hardly a conclusive determination of that patent's invalidity and hence the "worthlessness" of a non-exclusive license of that patent. See Appleton Toy & Furniture Co. v. Lehman Co., 7 Cir., 1948, 165 F.2d 801; Pope Mfg. Co. v. Owsley, C.C., N.D.Ill., 1886, 27 F. 100. But cf. Drackett Chemical Co. v. Chamberlain Co., 6 Cir., 1933, 63 F.2d 853.

Nor do we find that any different rule prevails in the State of New York. It is true that in Hazeltine Research, Inc., v. De Wald Radio Mfg. Corp., 194 Misc. 81, 84 N.Y.S.2d 597, in ruling on plaintiff's motion for summary judgment, Justice Hofstadter apparently held that the defense of eviction like that advanced in the case at bar was available in New York to a non-exclusive licensee being sued for royalties. We have examined the New York authorities cited by the court, and do not think that they support this conclusion. The leading case of Marston v. Swett, 1876, 66 N.Y. 206, 23 Am.Rep. 43, after retrial, 1880, 82 N. Y. 526, dealt with an exclusive license; we have already pointed out the important difference in this connection between an exclusive and a non-exclusive license. Herzog v. Heyman, 1897, 151 N.Y. 587, 45 N. E. 1127, 56 Am.St.Rep. 646, involved the sale or assignment of a patent, not a non-exclusive license agreement. The distinction is important. See Marston v. Swett, 1876, 66 N.Y. 206, 212–213, 23 Am.Rep. 43; 1 Williston, Contracts, § 137, Rev.Ed., 1936. In Buffalo Rubber Mfg. Co. v. Batavia Rubber Co., 1915, 90 Misc. 418, 153 N.Y.S. 779, the license was taken by defendant upon a representation that the licensor had a patent application pending, when in fact such application had been rejected by the Patent Office on the ground of prior invention by an earlier patentee; and the court held that the false representation was sufficient ground in equity for the rescission of the license agreement induced thereby. In Pomeroy v. New York Hippodrome Corp., 1921, 197 App.Div. 114, 188 N.Y.S. 734, the license agreement was also made during the pendency of a patent application; however,

---

[2] See 2 Walker, Patents § 384, Deller Ed. 1937.

the patent sought, for the device covered by the license, was refused by the Patent Office, which allowed the licensor merely a patent for a minor improvement on an earlier patent. Appellant also cites Bottlers Seal Co. v. Rainey, 1919, 225 N.Y. 369, 373, 122 N.E. 200; but the passage referred to was dictum merely, and furthermore the discussion was with reference to the position of an assignee of an exclusive license. Clearly none of these cases is controlling on the eviction question raised in the De Wald case and in the case at bar. It does not appear whether the attention of Justice Hofstadter in the De Wald case was directed to the aspects of the eviction doctrine we have already discussed. At any rate we are constrained to believe that the apparent holding in the De Wald case is not in accordance with the law of New York as it would be declared by the highest court of that state.

### IV. Repudiation

On September 18, 1947, several months after the filing of the complaint in the present case, Automatic wrote a letter to Hazeltine formally advising the latter, without more, that Automatic "has repudiated and terminated the License Agreement". Automatic asserts that this notice of "repudiation" extinguished its contract obligation to pay royalties. Perhaps a sufficient answer to this contention is that no such defense was set forth either in Automatic's answer or amended answer, or in its counter motion for summary judgment. Furthermore, giving every indulgence to Automatic's contention, such repudiation could operate only prospectively, and would not affect the judgment for minimum royalties for the contract year ending August 31, 1946, nor would it affect Automatic's liability for percentage royalties due for the period up to the date of such "repudiation". In addition to that, so far as it may be a question of federal law, in the absence of a cancellation option in the agreement, or of a substantial default by the licensor, the licensee cannot by any such unilateral notice of repudiation terminate its contract obligation under a license agreement having several years yet to run. St. Paul Plow Works v. Starling, 1891, 140

U.S. 184, 11 S.Ct. 803, 35 L.Ed. 404; Ohio Citizens Trust Co. v. Air-Way Elec. Appliance Corp., D.C.N.D.Ohio, 1944, 56 F. Supp. 1010. But cf. Martin v. New Trinidad Lake Asphalt Co., D.C.N.J., 1919, 255 F. 93, 94. Assuming that local law governs the matter, we are satisfied that, even if repudiation by the licensee is, in some circumstances, a defense in New York to a suit for royalties, Automatic's letter of September 18, 1947, does not meet the stringent requirements set forth in Skinner v. Wood Mowing and Reaping Machine Co., 1893, 140 N.Y. 217, 35 N.E. 491, 37 Am.St.Rep. 540.

The cases which have suggested the existence of some such doctrine of unilateral repudiation have explained that the licensee may announce unequivocally "that he no longer recognizes the binding force of the agreement, and that he will thereafter manufacture or use the article covered by the patent under a claim of right, founded upon the alleged invalidity of the patent, and in hostility to and defiance of the authority of the patent and the license, so that the licensor can thereafter proceed against him for an infringement of the patent, if he choose so to do." Martin v. New Trinidad Lake Asphalt Co., supra, D.C.N.J., 1919, 255 F. at page 94. See Skidmore v. Fahys Watch-Case Co., 1898, 28 App.Div. 94, 101, 50 N.Y.S. 1016, 1021-1022; L. Heller & Son, Inc., v. Lassner Co., 1925, 214 App.Div. 315, 318, 212 N.Y.S. 175, 180. But as we have already pointed out, under the license agreement in suit Automatic's liability for royalties does not depend upon its actual use of any of the licensed patents in the particular apparatus made and sold by it. If Automatic were permitted to repudiate the license agreement and in fact did not utilize any of the inventions covered by Hazeltine's patents, Hazeltine could not prevail in an infringement suit even if all its patents were valid; and Automatic would thus achieve immunity from liability by non-use of Hazeltine's patents, despite its contract undertaking to pay royalties, regardless of such use, for the right to make use of them. Hence, even assuming that a doctrine of unilateral repudiation might in some cases

810

be recognized, such a defense certainly would not be available under the circumstances of the case at bar.

The judgment of the District Court is affirmed.

· WOODBURY, Circuit Judge (dissenting).

In my view the decisive question on this appeal is the enforceability of a licensing agreement requiring the licensee to pay royalties even though in fact he does not make any use whatsoever of any invention embodied in a patent owned by the licensor. Such agreements as I see it necessarily have the effect of expanding a patent beyond the legitimate confines of the monopoly granted therein, and for many years the Supreme Court, because of the public interest dominant in the patent system, has held licensing agreements having that effect unenforceable in spite of the business convenience or even necessities of the parties. Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367; Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 665 et seq., 64 S.Ct. 268, 88 L.Ed. 376, and cases cited. Therefore, by parity of reasoning with the above cases I would hold the licensing agreement here in suit unenforceable.