The **KAISER TRADING COMPANY, a corporation, Kaiser Aluminum & Chemical Corporation, a corporation, Plaintiffs,**

v.

**ASSOCIATED METALS & MINERALS CORPORATION, a corporation, Defendant.**

**No. C–70 2253.**

United States District Court, N. D. California.

Dec. 14, 1970.

Thelen, Marrin, Johnson & Bridges, by Max Thelen, Jr., Ira A. Brown, Peter Anderson, San Francisco, Cal., for plaintiffs.

Heller, Ehrman, White & McAuliffe, by Weyman I. Lundquist, Stephen V. Bomse, J. Roger Beers, San Francisco, Cal., for defendant.

## OPINION AND ORDER

GERALD S. LEVIN, District Judge.

This action was commenced in the Superior Court in Alameda County, California, by the Kaiser Aluminum & Chemical Corporation and its wholly owned subsidiary, The Kaiser Trading Company [hereinafter referred to collectively as "Kaiser"],[1] against the Associated Metals & Minerals Corporation [hereinafter referred to as "Associated"] for breach of contract. Plaintiffs seek a preliminary injunction, specific performance, and money damages. The suit was removed to this court pursuant to 28 U.S.C. § 1441. The relevant facts are as follows:

The Kaiser Trading Company is in the business of buying and selling commodities throughout the world. Kaiser Aluminum & Chemical Corporation is a leading manufacturer of aluminum, with plants throughout the United States; through its associates and subsidiaries, it also has interests in aluminum throughout the world. Defendant Associated is in the business of buying and selling metals, minerals, chemicals, and related commodities. One such commodity, which is the subject matter of the contract giving rise to this action, is cryolite, an indispensable chemical compound used in the production of aluminum.[2]

In 1969, Kaiser and Associated entered into an agreement for the sale by Associated to Kaiser of 4,000 metric tons of cryolite produced in Italy by Industrie Chimiche Ing. Bonelli [hereinafter referred to as "ICIB"], from whom Associated has been purchasing cryolite for resale since 1951. This contract was similar to ones that had been entered into annually between Kaiser and Associated since 1964, all of which involved cryolite produced by ICIB. Under the terms of the 1969 contract,[3] as modified in March,

---

1. Both Kaiser Trading and Kaiser Aluminum are joined as plaintiffs because there is some confusion as to which is the actual party to the contract with Associated. The first page of the original agreement bears the name of Kaiser Trading and the second page the name of Kaiser Aluminum. The modification of the contract bears the name of Kaiser Trading. Plaintiffs' understanding is that the agreement was entered into between Kaiser Trading and Associated for the purchase of cryolite to be used in aluminum plants owned by Kaiser Aluminum or its associates. Associated does not dispute this understanding. To avoid confusion, but without deciding which party is the proper party to the contract, "Kaiser" as used in this opinion refers alternatively to both plaintiffs.

2. Cryolite is a mineral substance used in the manufacture of primary aluminum. It is found naturally only in one ore body located in Greenland. This source, however, has been effectively exhausted, and consumers of cryolite must rely upon a synthetically produced substitute, which is manufactured in various places throughout the world. In addition to synthetic cryolite, a certain amount of cryolite can be reclaimed from the aluminum manufacturing process itself and then reused.

3. The agreement was incorporated in the following letter:

Number 37704

July 1, 1969
September 8, 1969

## CONTRACT

Dear Sirs:

We take pleasure in confirming the following business transaction negotiated by us to-day:

ASSOCIATED METALS & MINERALS CORPORATION
733 THIRD AVENUE, NEW YORK, N.Y. 10017 Agree to sell

KAISER TRADING COMPANY
300 LAKESIDE DRIVE, OAKLAND 12, CALIFORNIA Agree to buy

| | | |
|---|---|---|
| MATERIAL & QUALITY | : | Synthetic Cryolite originating from the production of Industrie Chimiche Ing. Bonelli, I.C.I.B., Milan and to conform to the following specifications: |

| | |
|---|---|
| Na | min. 32% |
| F | min. 53% |
| $Al$ | min. 12.5% |
| $Fe_2O_3$ | max. 0.10% |
| $SiO_2$ | max. 0.30% |
| $Al_2O_3$ | max. 0.2–1% |
| Pb | max. 0.005% |
| $H_2O$ | max. 0.20% |
| $CaF_2$ | max. 0.20% |

Mechanical composition: Powder form max. 6 mm.

| | | |
|---|---|---|
| QUANTITY | : | 4000 metric tons |
| PRICE | : | Italian Lire 132160.00 per short ton of 2000 lbs. FOB Venice, (Italy), including packing. |
| PACKING | : | Six-ply paperbags with one (1) bituminized inner-layer, each bag to contain 50 kos. net. |
| SHIPMENT | : | Available for shipment FOB Venice: |

500 metric tons end January/February, 1970.
500 metric tons May, 1970.
3000 metric tons in monthly lots of 500 tons July to December, 1970,

in vessels to be nominated by buyer in mutual agreement with seller.

Buyer will give to seller a pre-advice of at least 60 days of expected readiness (ETA) of each vessel and such ETA has to be mutually agreed upon. At the same time buyer is requested to give instructions for marking of bags.

Buyer may request the accumulation of 2 monthly lots of 500 tons each in order to ship 1000 tons in one lot and Seller will, under normal circumstances, oblige herewith provided payment is being made as under clause "Payments".

| | | |
|---|---|---|
| WEIGHTS | : | As determined by the producing plant and evidenced by certificate of weight of producing plant to govern. |
| ANALYSIS | : | As determined by producing plant and evidenced by plant's certificate to govern. |
| PAYMENT | : | Net cash promptly against commercial invoice accompanied by certificates of weight, analysis and dock or mate's receipt. |

In case buyer requests shipment of 1000 tons in one lot, (see clause "Shipment") then buyer will pay for the first 500 tons against invoice, certificates of weight and analysis and confirmation of supplying plant that this lot is ready and being held at the disposal of buyer at seller's plant.

The value of the second 500 tons is to be paid in an interval of 25 days against invoice, certificates of analysis and weight and statement that the lot is held at the disposal of buyer at the producing plant; or if shipment of the 1000 tons is being made earlier than 25 days, then payment of the second 500 tons is to be made as usual, against invoice, certificates of weight and analysis and dock respectively mate's receipt.

| | | |
|---|---|---|
| SPECIAL CONDITIONS | : | The supplying plant will take representative samples from each lot shipped and one of these samples will be sent to buyer. |
| FORCE MAJEURE | : | Usual force majeure conditions apply. |
| ACCEPTED | : | |

KAISER ALUMINUM & CHEMICAL CORPORATION

B.Y. ABADIR /s/

ASSOCIATED METALS & MINERALS CORPORATION

H. STERN /s/

1969,[4] the cryolite was to be delivered in 500 ton installments, one installment during the spring of 1970, four installments in September, October, November, and December of 1970 respectively, and the remaining installments during the first quarter of 1971. To date, only the first 500 tons have been delivered.

In September, 1970, Associated informed Kaiser that it no longer considered itself obligated under the contract and that it did not intend to make any more deliveries of cryolite.[5] Associated's alleged justification for repudiating the contract was that Kaiser had been surreptitiously negotiating with ICIB during 1969 and 1970 and had concluded a contract with them under which, commencing in 1971, ICIB would supply cryolite directly to Kaiser, thus eliminating Associated's future role as a middleman between Kaiser and ICIB.[6] Associated

4. The modification to the agreement was incorporated in the following letter:

March 10, 1970

The Kaiser Trading Company
Kaiser Center, 300 Lakeside Drive
Oakland, Cal. 94604

Attention: Mr. H. M. Dieterle, Traffic Dept.

Re: Cryolite/Our Contract #37704
Gentlemen: Your No. C-773

We refer to our letter of March 3d and want to inform you that our Milan office has taken up contract with OTIM and agreed to work the shipment of the first 500 tons out in mutual cooperation.

Our supplier will make available additional lots of about 500 tons each as follows:

500 tons end of September
500 tons end of October
500 tons end of November
500 tons end of December

It would be advisable to select vessels which are scheduled about 5 or 10 days later than the end of the respective month in order to have some leeway, i. e., for the end of September lot a vessel should be nominated for October 5/10th. In case these additional lots are also being handled by you through OTIM then we shall ask our office to work together with OTIM in the same way as for the first lot. We, therefore, are looking forward to hearing from you as to whether our friends should contact OTIM.

You will have noticed that there will not be a lot available during August, but this is generally the vacation month in Italy and one can not expect too much during this month.

Just for order's sake, we mention that this schedule is being given to you under reservation that production will not be interrupted by strikes as this nowadays often happens in Italy and that operations will not have to be stopped from time to time due to delay in deliveries of raw material.

There remains 1500 tons for January/February/March 1971 for which you still have to give instructions.

We trust that everything can be worked out to your satisfaction.

Very truly yours,
ASSOCIATED METALS & MINERALS CORP.
H. STERN /s/

5. See Letter of S. Eliel, Vice-President, Associated Metals & Minerals Corp., to The Kaiser Trading Co., Sept. 23, 1970.

6. Associated and Kaiser strongly contest the propriety of Kaiser's actions in regard to ICIB. For purposes of this opinion, however, no decision on the merits need be made as to this dispute, and nothing in this opinion precludes Associated from raising by way of a suit on its own part Kaiser's alleged tortious interference with its contractual rights with ICIB.

alleges that the agreement between Kaiser and ICIB violated Associated's agreement with ICIB making Associated the exclusive purchaser of cryolite from ICIB for Kaiser.[7] Associated claims that because Kaiser's dealings with ICIB amounted to tortious interference with Associated's contractual rights and were anticompetitive in effect, it was no longer obligated under its contract with Kaiser to deliver cryolite.

Presently before the court is Kaiser's motion for a preliminary injunction to restrain Associated from failing to perform under the contract. In opposition to such motion, Associated argues that (1) it was justified in repudiating the contract and thus is not in breach; (2) no showing of irreparable injury has been made; and (3) Kaiser is precluded from obtaining equitable relief because its activities with regard to ICIB tainted it with unclean hands.

## I

## REPUDIATION BY ASSOCIATED OF THE CONTRACT WITH KAISER

Associated contends that it was relieved of its obligation to perform under the contract with Kaiser on two grounds: (1) Kaiser's secret negotiations and subsequent agreement with ICIB constituted a tortious interference with Associated's contractual rights with ICIB and therefore a breach by Kaiser of its contract with Associated, relieving Associated of its obligation to make further deliveries of cryolite; and (2) Kaiser's activities in regard to ICIB were anticompetitive and monopolistic, rendering its contract with Associated illegal, against public policy, and thus unenforceable.

### A. Tortious Interference

Even assuming in arguendo that Kaiser induced ICIB to breach its exclusive sales agreement with Associated and thereby committed actionable interference with Associated's contractual rights,[8] Associated was not justified in its repudiation of the contract in suit. No case could be found, and no commentator has suggested, that a tort committed by one party to a contract against the other, independent of the contract itself, is a defense to a breach of contract action by the tortfeasor. In fact, only one case could be found in which an unrelated tort of any kind has been raised

---

7. The basis for this alleged exclusive arrangement is the following letter:

November 29, 1966

Industrie Chimiche Ing. Bonelli
Via C. Battisti 4
Milan

SUBJECT: CRYOLITE—EXCLUSIVE RIGHTS

Gentlemen:

We refer to our telephone conversations. We have advised our principal, the Associated Metals of New York, of your agreement to grant exclusive rights with respect to all consumers to whom we have already effected sales and with respect to those consumers with whom our client is under negotiations, specifically:

> KAISER ALUMINUM
> INTALCO
> HINDUSTAN ALUMINUM CO. LTD (hindalco)
> INDIAN ALUMINUM CO. LTD. (Indal)
> MADRAS ALUMINUM CO. LTD.

Thanking you and asking you to return to us a copy of the present letter signed by you in confirmation of your approval, we beg to remain,

Yours very truly,

Louis Wurzmann

S/Signature
Industrie Chimiche Ing. Bonelli S.p.A.

---

8. California, as do most jurisdictions, recognizes the tort of interference with another's contractual relations, which protects contracting parties from the actions

as a defense to breach of contract by the tortiously wronged party. Sheriff v. Weimer, 88 Ga.App. 80, 76 S.E.2d 33 (1953). In *Sheriff,* the court stated:

> Where * * * the petition alleges an indebtedness owing to the plaintiff by the defendant, and the creation of that indebtedness by specific transactions and express promises of the defendant to repay the plaintiff the sums paid, the fact that the petition shows incidentally that a meretricious relationship also existed between the parties at the time the contracts were made, or that the plaintiff had or was perpetrating a fraud on the defendant in connection with some other matter, does not affect the right of the plaintiff to recover on an otherwise valid promise of the defendant.

76 S.E.2d at 34; *cf.* Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists, 227 Cal.App.2d 675, 39 Cal.Rptr. 64 (1964), discussed *infra.*

In other situations, the courts also have rejected defenses that are unrelated to the contract in suit. In Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 176 F.2d 799 (1st Cir. 1949), aff'd on other grounds, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950),[9] in which a suit was brought to recover royalties due under a patent licensing agreement and a defense was interposed that plaintiff had used duress and threats of patent infringement suits to acquire other licensing agreements with third parties, the court held:

> [S]uch wrongful conduct in respect to third persons would constitute no defense * * *. A promisee's cause of action on one contract cannot be defeated merely by a showing that the promisee had improperly coerced third parties into entering into similar contracts with him.

*Id.* at 805. Furthermore, courts have held that breach of a contract independent of the contract in suit is not a defense to breach of the latter. *See* Hal Roach Studios, Inc. v. Film Classics, Inc., 156 F.2d 596, 599 (2d Cir. 1946); Levi v. L. A. Thompson Scenic Ry. Co., 128 Misc. 465, 218 N.Y.S. 666 (App.T. 1926); William J. Dixon & Co. v. Bronston Bros. & Co., Inc., 171 App.Div. 552, 157 N.Y.S. 335 (App.Div.1916). *See generally* 17A C.J.S. Contracts § 525(1) at 1016–1017.

Associated also alleges that by secretly negotiating with ICIB, inducing ICIB to breach its agreement with Associated, and eliminating Associated as a future purchaser of cryolite from ICIB for Kaiser, Kaiser breached the implied covenant of good faith and fair dealing in its contract with Associated. Thus, Associated argues, Kaiser was in breach of the instant contract and Associated was not obligated to perform by delivering the cryolite.

It is of course true that if one party is in material breach of contract, the other party need not perform,[10] but in the case at bar Kaiser is not in breach of its contract with Associated. The implied covenant of good faith and fair dealing is "that neither party will do anything which will injure the right of the other party to receive the benefits of the agreement." Merritt v. J. A. Stafford Co., 68 Cal.2d 619, 626, 68 Cal.Rptr. 447, 451, 440 P.2d 927, 931 (1968); *see* Crisci v. Security Ins. Co., 66 Cal.2d 425, 429, 58 Cal.Rptr. 13, 16, 426 P.2d 173, 176

---

of third parties in inducing breach. *See, e. g.,* Herron v. State Farm Mut. Ins. Co., 56 Cal.2d 202, 14 Cal.Rptr. 294, 363 P.2d 310 (1961); Mull v. Hunter, 266 Cal.App.2d 657, 72 Cal.Rptr. 201 (1968); Friedman v. Jackson, 266 Cal.App.2d 517, 72 Cal.Rptr. 129 (1968).

9. Although the Supreme Court's decision affirming *Hazeltine* was expressly overruled in Lear, Inc. v. Adkins, 395 U.S. 653, 671, 89 S.Ct. 1902, 23 L.Ed.2d 610

(1969), it was done so only in regard to the doctrine of patent licensee estoppel, thus not affecting the reasoning of *Hazeltine* relied upon here or elsewhere in this opinion.

10. *See, e. g.,* Gold Mining & Water Co. v. Swinerton, 23 Cal.2d 19, 33, 142 P.2d 22, 29 (1943); Pry Corp. of America v. Leach, 177 Cal.App.2d 632, 639, 2 Cal.Rptr. 425, 430 (1960).

(1967). In the instant case, however, Kaiser is not impairing Associated's rights under its contract with Kaiser; on the contrary, it is attempting to effectuate the contract as written, with all its attendant rights and benefits. Even if all of Associated's allegations are true, Kaiser, at worst, injured Associated's contractual rights with ICIB, not with Kaiser. Cases cited by Associated in support of its contention [11] are readily distinguishable.

In sum, Associated was not justified in repudiating its contract with Kaiser because of Kaiser's alleged activities in regard to ICIB.

### B. Alleged Illegality of the Contract

■ Associated also argues that it was not obligated to perform under the contract because it constitutes an illegal restraint on trade and therefore is unenforceable. Although the courts will not enforce a contract that is an illegal restraint on trade,[12] it is the contract being sued upon which must give rise to the illegal or anticompetitive effect; it is not enough that the plaintiff's general activities are anticompetitive. See Kelly v. Kosuga, 358 U.S. 516, 520–521, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 754–756, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947). As the court stated in Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 176 F.2d 799, 805 (1st Cir. 1949), aff'd on other grounds, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950):[13]

The district court correctly ruled that, even assuming arguendo that Hazeltine was engaged in an unlawful scheme to maintain a monopoly, the license contract in suit was not an integral part of it; that the license agreement, being itself a valid contract, will not be rendered unenforceable by collateral activities of the plaintiff in violation of the anti-trust laws.

■ In the case at bar, all of Associated's arguments are directed to Kaiser's activities with ICIB and its alleged intent to monopolize the cryolite market. Even if these allegations were true, however, Associated has not indicated that its contract with Kaiser to sell 4,000 tons of cryolite is an illegal restraint on trade or gives rise to such a restraint.

### II

### ESSENTIAL FACTORS FOR THE GRANTING OF EQUITABLE RELIEF REQUESTED BY KAISER

The court is cognizant of the equitable principles required to be satisfied in order to justify the granting of a preliminary injunction. These principles were stated concisely in Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler, 305 F. Supp. 1210, 1213 (N.D.Cal.1969):

(1) probability of success on the merits at trial;

(2) irreparable injury;

(3) maintenance of the status quo;

(4) a balance of equities in favor of plaintiff.

Associated has stressed the factor of irreparable injury as indispensable to the granting of the equitable relief requested by Kaiser and therefore it will be considered first in order.

### A. Irreparable Injury

■■ A prerequisite to issuance of a preliminary injunction is that in its ab-

---

11. Universal Sales Corp., Ltd. v. California Press Mfg. Co., 20 Cal.2d 751, 128 P.2d 665 (1942); Hartman Ranch Co. v. Associated Oil Co., 10 Cal.2d 232, 73 P.2d 1163 (1937); Harrison v. Cook, 213 Cal.App.2d 527, 29 Cal.Rptr. 269 (1963); Pry Corp. of America v. Leach, 177 Cal. App.2d 632, 2 Cal.Rptr. 425 (1960); Milton v. Hudson Sales Corp., 152 Cal.App. 2d 418, 313 P.2d 936 (1957); Bergum v.

Weber, 136 Cal.App.2d 389, 288 P.2d 623 (1955); Matzen v. Horwitz, 102 Cal. App.2d 884, 228 P.2d 841 (1951); Brawley v. Crosby Research Foundation, Inc., 73 Cal.App.2d 103, 166 P.2d 392 (1946).

12. See, e. g., Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909).

13. See note 9 supra.

sence plaintiff will be subjected to irreparable harm—injury that is "certain and great." Quon v. Stans, 309 F.Supp. 604, 607 (N.D.Cal.1970); Flood v. Kuhn, 309 F.Supp. 793, 799 (S.D.N.Y.1970); see, Dymo Industries, Inc. v. Typeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964); Washington Capitols Basketball Club, Inc. v. Barry, 304 F.Supp. 1193, 1196, 1197 (N.D.Cal.), aff'd, 419 F.2d 472 (9th Cir. 1969). Before determining the existence of such injury, however, a threshold inquiry must be made to ascertain whether a preliminary injunction would be available under California law,[14] which provides that an injunction may not be issued to enforce contractual rights except under circumstances in which specific performance would be an available remedy.[15]

14. Since jurisdiction is based upon diversity of citizenship, state law is controlling in the determination of substantive rights. See Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The courts are in conflict, however, as to whether state or federal law governs the issuance of an injunction. Compare General Electric Co. v. American Wholesale Co., 235 F.2d 606, 608 (7th Cir. 1956); Martin v. Reynolds Metals Co., 224 F.Supp. 978, 982 (D.Or. 1963), appeal dismissed, 336 F.2d 876 (9th Cir. 1964), aff'd on other grounds, 337 F.2d 780 (9th Cir. 1964) with Franke v. Wiltschek, 209 F.2d 493, 494, 496–497 (2d Cir. 1953); Anglo-American Inv. Trust, Ltd. v. Pearson, 294 F.Supp. 1150, 1153 (E.D.Wis.1969); Standard Brands, Inc. v. Zumpe, 264 F.Supp. 254, 263 (E.D.La.1967); Port of New York Authority v. Eastern Airlines, Inc., 259 F. Supp. 745, 753 (E.D.N.Y.1966); Paramount Pictures Corp. v. Holden, 166 F. Supp. 684, 688–689 (S.D.Cal.1958); Baltimore & O. R. R. Co. v. Halchak, 71 F.Supp. 224, 226 (W.D.Pa.1947).

To some degree, this conflict among the courts may be the result of two potentially inconsistent statements in *Guaranty Trust*. At one point the Supreme Court stated that "a federal court may afford an equitable remedy for a substantive right recognized by a State even though a State court cannot give it." 326 U.S. at 106, 65 S.Ct. at 1468. A few pages later, however, the Court, in attempting to clarify the substantive/procedural distinction established by *Erie*, noted that whether at law or in equity, "the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of the litigation, as it would be if tried in a State court." *Id.* at 109, 65 S.Ct. at 1470. The inconsistency between these quoted passages becomes particularly apparent in an application for a preliminary injunction because such a

remedy is often "so inextricably interwoven with the substantive right invaded that the denial of the remedy would be tantamount to the denial of the right." Port of New York Authority v. Eastern Airlines, Inc., 259 F.Supp. 745, 753 (E.D.N.Y.1966).

In the instant case, Kaiser is requesting that its contract with Associated be enforced—first by issuance of a preliminary injunction and ultimately by an order of specific performance—because a suit for damages would be inadequate. Such equitable relief, therefore, is the very essence of this action, and its availability cannot be considered merely a procedural matter that would not "substantially" affect "the outcome of the litigation." *See* Guaranty Trust Co. of New York v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). *See generally* 7 J. Moore, Federal Practice ¶ 65.18 [1] at 1683–84 (2d ed. 1970).

Consequently, since under California law the availability of a preliminary injunction to enforce a contract is limited to certain specified situations, *see* note 15 *infra*, the best approach would be to look to state law to determine if a preliminary injunction is permissible. *Cf.* Paramount Pictures Corp. v. Holden, 166 F.Supp. 684, 688–689 (S.D.Cal.1958). Then, because the issuance of a preliminary injunction is in the court's discretion according to both federal and state law, *see* Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964); Continental Baking Co. v. Katz, 68 Cal. 2d 512, 527, 67 Cal.Rptr. 761, 770, 439 P.2d 889, 898 (1968), look to federal law to determine whether the court should exercise its discretion. *Cf.* General Electric Co. v. American Wholesale Co., 235 F.2d 606, 608 (7th Cir. 1956); Paramount Pictures Corp. v. Holden, 166 F. Supp. 684, 689 n. 10 (S.D.Cal.1958).

15. Section 526 of the California Code of Civil Procedure provides in pertinent part

### 1. *Specific Performance*

Specific performance as a buyer's remedy for breach of a contract to sell goods "may be decreed where the goods are unique or in other proper circumstances." Cal. Commercial Code § 2716(1). The enactment of this statutory provision broadened the availability of specific performance from those situations involving only ascertained or specified goods to situations involving "other proper circumstances." *Compare* Cal. Commercial Code § 2716(1) *with* Cal. Civil Code § 1788 (repealed Sales Act provision). Moreover, the comments to section 2716 state:

> Specific performance is no longer limited to goods which are already specific or ascertained at the time of contracting. The test of uniqueness under this section must be made in terms of the total situation which characterizes the contract. Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation, * * * However, uniqueness is not the sole basis of the remedy under this section for the relief may also be granted "in other proper circumstances" and *inability to cover is strong evidence of "other proper circumstances"*.[16]

Although no California case has held explicitly that an inability to cover is sufficient justification for decreeing specific performance, the state supreme court in Bomberger v. McKelvey, 35 Cal. 2d 607, 616, 220 P.2d 729, 734 (1950), did state that scarcity of goods constituting the subject matter of the breached contract is a very significant factor in determining whether to order specific performance. The court in *Bomberger* also noted the " 'growing tendency' to allow specific performance where damages are not the equivalent of the performance." *Id.* at 616–617, 220 P.2d at 735.

Courts in other jurisdictions have ruled that specific performance will be decreed when the goods contracted for cannot be purchased on the open market or otherwise covered. *See, e. g.,* Hogan v. Norfleet, 113 So.2d 437, 439 (Fla.Dist. Ct.App.1959); Heidner v. Hewitt Chevrolet Co., 166 Kan. 11, 199 P.2d 481, 483 (1948); Poltorak v. Jackson Chevrolet Co., 322 Mass. 699, 79 N.E.2d 285 (1948); Jaup v. Olmstead, 334 Mich. 614, 55 N.W.2d 119, 120 (1952); Likens v. Sourk, 263 S.W.2d 462, 465 (Mo.App. 1953); Boeving v. Vandover, 240 Mo. App. 117, 218 S.W.2d 175, 177–178 (1949); Paullus v. Yarbrough, 219 Or. 611, 347 P.2d 620, 635 (1959); Cochrane v. Szpakowski, 355 Pa. 357, 49 A.2d 692, 694 (1946); Thompson v. Virginia, 197 Va. 208, 89 S.E.2d 64, 67 (1955).

Finally, many cases have noted the trend toward relaxing the requirements for specific performance, particularly those decided since adoption of the Uniform Sales Act and its even more liberal successor, the Uniform Commercial Code. *See, e. g.,* Hunt Foods, Inc. v. O'Disho, 98 F.Supp. 267, 270 (N.D.Cal. 1951); Bomberger v. McKelvey, 35 Cal. 2d 607, 616–617, 220 P.2d 729, 735 (1950); Capaldi v. Levy, 1 Cal.App.3d 274, 281, 81 Cal.Rptr. 629, 633 (1969); Price v. McConnell, 184 Cal.App.2d 660, 666, 7 Cal.Rptr. 695, 698–699 (1960).

▮▮▮▮▮ Despite the absence of California decisions interpreting the "other proper circumstances" phrase of Cal. Commercial Code § 2716(1), the Code comments, in conjunction with prior case law, decisions in other jurisdictions, and the general trend toward a more liberalized availability of specific performance, persuade this court that the remedy

---

that "[a]n injunction can not be granted * * * [t]o prevent the breach of a contract * * * the performance of which would not be specifically enforced; * * * "

16. Cal.Commercial Code § 2716, UCC Comment 2 (emphasis added). The quoted comment is that of the drafters of the Uniform Commercial Code; section 2716 of the California Code is, however, a verbatim enactment of section 2-716 of the UCC.

should be available when goods cannot be covered or replaced. Accordingly, a preliminary injunction may issue if all other requirements are satisfied.

### 2. *Kaiser's Showing of Injury*

 Although a preliminary injunction in the case at bar is not prohibited by California law, its issuance is still in the court's discretion and requires a showing of irreparable injury. Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1959); Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler, 305 F.Supp. 1210, 1212–1213 (N.D.Cal.1969). Moreover, if there is an adequate remedy in money damages, injunctive relief should not be granted. Parker v. Winnipiseogee Lake Cotton & Woollen Co., 67 U.S. (2 Black) 545, 551, 17 L.Ed. 333 (1862); Ogden River Water Users' Ass'n v. Weber Basin Water Conservancy, 238 F.2d 936, 942 (10th Cir. 1956); Clemons v. Board of Educ., 228 F.2d 853, 857 (6th Cir.), cert. denied, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956); Washington Capitols Basketball Club, Inc. v. Barry, 304 F.Supp. 1193, 1197 (N.D.Cal.), aff'd, 419 F.2d 472 (9th Cir. 1969); Thayer Plymouth Center, Inc. v. Chrysler Motors Corp., 255 Cal. App.2d 300, 306, 63 Cal.Rptr. 148, 152 (1967).

In the present case, the parties strongly contest the irreparability of the injury that Kaiser will sustain. Kaiser contends that there is no alternative supply of cryolite, and consequently, without the cryolite it had contracted for with Associated, it will be unable to meet contractual commitments to its associates,

who then will be unable to start up and operate their aluminum reduction plants.[17] Kaiser also contends that it will not even be able to meet its own domestic consumption requirements, thus forcing a curtailment of operations and concomitant irreparable damage.[18] On the other hand, Associated argues that the free market supply of cryolite is not completely exhausted, that Kaiser has sufficient cryolite to meet its own aluminum production needs, and that any damage suffered due to Kaiser's inability to meet its contractual commitments can be compensated for adequately in money damages.[19]

 In determining whether to issue a preliminary injunction, a court is not required to decide difficult questions of fact. Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964); Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler, 305 F.Supp. 1210, 1213 (N.D.Cal.1969); Alpha Distributing Co., Inc. v. Jack Daniel's Distillery, Inc., 207 F.Supp. 136, 138 (N.D.Cal. 1961), aff'd, 304 F.2d 451 (9th Cir. 1962). Without attempting to resolve any factual disputes, however, it can be gleaned from the data before the court that the supply of cryolite is indeed very scarce. Associated claims, and Kaiser to an extent agrees, that some cryolite is available on the open market, but the instances of availability involve only a few hundred tons,[20] whereas the contract in suit calls for the delivery of 3,500 tons within the next few months.[21] Also indicating the scarcity of cryolite is the considerable increase in price during the past year.[22] Given the indispensable

---

17. Declaration of Bush Y. Abadir at 5–5a, 8 (Oct. 6, 1970).

18. *Id.* at 3.

19. Affidavit of Nathan Federgreen at 10–14 (Oct. 26, 1970); Defendant's Memorandum of Points and Authorities at 16–20 (Oct. 27, 1970).

20. Declaration of Bush Y. Abadir at 7–8 (Oct. 6, 1970); Affidavit of Nathan Federgreen at 13 (Oct. 26, 1970); Defendant's Memorandum of Points and Authorities at 15 (Oct. 27, 1970).

21. *See* note 4 *supra.*

22. Affidavit of Bush Y. Abadir at 8–9 (Nov. 2, 1970); Declaration of Bush Y. Abadir at 6–8 (Oct. 6, 1970); Affidavit of Nathan Federgreen at 13 (Oct. 26, 1970); Defendant's Memorandum of Points and Authorities at 18 (Oct. 27, 1970).

Subsequent to repudiating its contract with Kaiser, Associated stated that it would sell up to 500 tons of cryolite to Kaiser at approximately $595 per metric ton, an increase of more than $350 per

character of cryolite in the production of aluminum and the inability of Kaiser to cover the 3,500 tons allegedly due under its contract with Associated, it seems probable that Kaiser will be subjected to injury that is certain and great.

### B. Probability of Success on the Merits at Trial

 Even assuming, however, that Kaiser has not made as satisfactory a showing of irreparable injury as is generally desirable, an injunction may still issue. As the court stated in Flood v. Kuhn, 309 F.Supp. 793, 798 (S.D.N.Y. 1970):

> Where there is a "lack of adequate showing of irreparable damage" the party seeking a preliminary injunction must convince the court with reasonable certainty that it will ultimately succeed.

See Unicon Management Corp. v. Koppers Co., Inc., 366 F.2d 199, 204 (2d Cir. 1966). See also Fletcher Co. v. Rock of Ages Corp., 326 F.2d 13, 17 (2d Cir. 1963). In light of the above discussion of Associated's alleged justification for repudiating its contract with Kaiser, it appears with reasonable certainty that Kaiser will ultimately succeed on the merits.

### C. Balancing of Equities

 In addition to weighing the relative showings of irreparable injury and probability of success on the merits, the court also must take into consideration the balance of hardships to the parties. See, e. g., King v. Saddleback Junior College Dist., 425 F.2d 426, 427 (9th Cir. 1970); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323–324 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); Unicon Management Corp. v. Koppers Co.,

Inc., 366 F.2d 199, 205 (2d Cir. 1966); Quon v. Stans, 309 F.Supp. 604, 607 (N.D.Cal.1970); Flood v. Kuhn, 309 F. Supp. 793, 798 (S.D.N.Y.1970); Washington Capitols Basketball Club, Inc. v. Barry, 304 F.Supp. 1193, 1197 (N.D. Cal.), aff'd, 419 F.2d 472 (9th Cir. 1969).

In balancing equities, the court should view the disadvantages incurred by the party sought to be enjoined and the advantages gained by the party seeking the injunction. Hamilton Watch Co. v. Benrus Watch Co., Inc., 206 F.2d 738, 743 (2d Cir. 1953); Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler, 305 F. Supp. 1210, 1216 (N.D.Cal.1969). The determination is whether "the burden of an interlocutory injunction [is] all out of balance with the benefit to be obtained by the plaintiff." Alpha Distributing Co., Inc. v. Jas. Barclay and Co., Ltd., 215 F.2d 510, 511 (9th Cir. 1954).

 In the instant case, issuance of an injunction would benefit Kaiser to the extent of realizing the fruits of its contract with Associated; Associated would be disadvantaged to the extent of being required to comply with the contract, notwithstanding its allegedly justified repudiation. Furthermore, even if Associated were to prevail ultimately on the merits by justifying its repudiation of the contract, the probability of which is not substantial, it could be recompensed adequately in money damages. In contrast, by not issuing an injunction Associated would realize the advantage of being able to sell the cryolite at a price considerably in excess of the contract price with Kaiser, and Kaiser, not being able to cover, could be forced to curtail its aluminum production and breach contracts for sale of cryolite to its associate companies, possibly causing them to refrain from commencing operation of new aluminum reduction plants. In examin-

ton over the price agreed upon in the 1969 contract. As stated in the letter proposing this offer, Associated's purpose was to prevent any irreparable harm to British Metals, which had contracted with Kaiser for the sale of cryolite, and, because Kaiser could not deliver, might have

to close down its aluminum reduction plants. See Letter from Weyman I. Lundquist of Heller, Ehrman, White & McAuliffe, Counsel for Associated, to Thelan, Marrin, Johnson & Bridges, Counsel for Kaiser, Oct. 29, 1970.

ing these relative hardships, the balance of equities tips decidedly in favor of Kaiser.[23]

### D. Maintenance of the Status Quo

In Washington Capitols Basketball Club, Inc. v. Barry, 419 F.2d 472, 476 (9th Cir. 1969), the court defined this principle:

> The function of a preliminary injunction is to maintain the *status quo ante litem* pending a determination of the action on the merits. The status quo is the last, uncontested status preceding the commencement of the controversy.

*See* Beverage Distributors, Inc. v. Olympia Brewing Co., 395 F.2d 850 (9th Cir. 1968); Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 808–809 (9th Cir.), cert. denied, 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963).

 The last uncontested status of the parties in the instant case appears to embrace the performance of the contract by the parties. Associated delivered to Kaiser cryolite during the spring of 1970 in accordance with the terms of the contract, but failed to make deliveries in September, October, and November of 1970, which were required therein. In September, therefore, the contest regarding the obligation of Associated to comply with the terms of the contract came into existence.

Upon consideration of Kaiser's showing of possible irreparable injury, the probability of Kaiser's success on the merits, the relative hardships to the parties, and the maintenance of the status quo, this case presents an appropriate situation for issuance of a preliminary injunction, unless Kaiser is precluded from obtaining such equitable relief by the doctrine of unclean hands.

### III

### THE DOCTRINE OF UNCLEAN HANDS

 It is a fundamental maxim that in order to invoke equity jurisdiction, the party seeking relief must come into court with clean hands. Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). The bad conduct, however, must pertain to the subject matter of the suit and affect the equitable relations between the litigants. Washington Capitols Basketball Club, Inc. v. Barry, 304 F.Supp. 1193, 1200–1201 (N.D.Cal.), aff'd, 419 F.2d 472 (9th Cir. 1969).

> [M]isconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands. The concept invoking the denial of relief is not intended to serve as punishment for extraneous transgressions, but instead is based upon "considerations that make for the advancement of right and justice." * * *

What is material is not that the plaintiff's hands are dirty, but that he

---

23. In balancing equities, the court also must weigh the consequences of issuing an injunction against the public interest. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Pennsylvania v. Williams, 294 U.S. 176, 185, 55 S.Ct. 380, 79 L.Ed. 841 (1935); King v. Saddleback Junior College Dist., 425 F.2d 426, 427 (9th Cir. 1970). Even, however, if Kaiser's activities in regard to ICIB amounted to a restraint on trade as contended by Associated, an injunction ordering Associated to perform under its contract with Kaiser would have no relationship to or impact upon such alleged anticompetitive acts. A valid contract "will not be rendered unenforceable by collateral activities of plaintiff in violation of the antitrust laws." Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 176 F.2d 799, 805 (1st Cir. 1949), aff'd on other grounds, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) (see note 9 *supra*); *see* Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 755–756, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); Lewis v. Seanor Coal Co., 382 F.2d 437, 441 (3d Cir. 1967), cert. denied, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968); Hughes Tool Co. v. Motion Picture Ass'n, Inc., 66 F.Supp. 1006, 1013 (S.D.N.Y. 1946).

dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant.

Republic Molding Corp. v. B. W. Photo Utilities, 319 F.2d 347, 349 (9th Cir. 1963), *citing* Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933); *see* Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 492–493, 62 S.Ct. 402, 86 L.Ed 363 (1942); *cf.* Toomer v. Witsell, 334 U.S. 385, 393, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

In the instant case, Associated claims that Kaiser's tortious actions in interfering with Associated's contractual rights with ICIB tainted Kaiser with unclean hands in this suit against Associated for the latter's refusal to deliver cryolite to Kaiser under its contract with Kaiser.

Only one reported case could be found that involved a situation in which tortious interference with contractual rights was offered as a basis for the defense of unclean hands in an action unrelated to such interference. In Messenger Publishing Co. v. Mokstad, 257 Ill.App. 161 (1930), plaintiff sought an injunction to prohibit defendant from hiring away its salesmen, who were under contract with plaintiff. The court, refusing to find that plaintiff had unclean hands because allegedly he had in the past tried to hire away some of defendant's salesmen, stated that the clean hands rule "is limited to the misconduct of the complainant in regard to the matter in litigation." *Id.* at 167.

An analogous situation was presented in Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists, 227 Cal.App.2d 675, 39 Cal.Rptr. 64 (1964), in which plaintiff sought an injunction to restrain defendants from obstructing access to plaintiff's plant and from threatening or harming persons attempting to enter or leave the plant. Defendants sought to raise the defense of unclean hands on the basis of plaintiff's alleged misrepresentations and breach of contract with defendants, which were the purported reasons for defendants' conduct. Rejecting defendants' arguments, the court explained the circumstances under which the clean hands doctrine may be invoked:

> The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i. e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants. Accordingly, relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court.

Id. at 728–729, 39 Cal.Rptr. at 97. The court then went on to apply this test to the facts in *Fibreboard*:

> [T]he assertion of unclean hands is not directed to the "transaction" before the court in the instant case. That transaction involves whether defendants were guilty of tortious conduct. It would amount to a straining of the doctrine to hold that defendants could escape liability for tort because Fibreboard breached its contract or because it was guilty of fraudulent misrepresentations. The wrong done to Fibreboard, which is the basis of its cause of action for damages, is independent of the transaction arising from the alleged breach of contract or misrepresentations. * * * Retribution for Fibreboard's breach of contract or fraudulent misrepresentations, if such existed, cannot be vindicated under the doctrine of unclean hands.

*Id.* at 729, 39 Cal.Rptr. at 97–98; *see* Hill v. Younkin, 274 Cal.App.2d 880, 884, 79 Cal.Rptr. 509, 512 (1969); Bradley Co. v. Bradley, 165 Cal. 237, 242, 131 P. 750, 752 (1913); Hamrick v. Hamrick, 119 Cal.App.2d 839, 847, 260 P.2d 188, 192–193 (1953); *cf.* Moriarty v. Carlson, 184 Cal.App.2d 51, 54–57, 7 Cal.Rptr. 282, 284–285 (1960); Carman v. Athearn, 77 Cal.App.2d 585, 598–599, 175 P.2d 926, 934 (1947).

Associated also attempts to establish unclean hands on the basis of the anti-competitive effect of Kaiser's activity. For reasons already stated, this argument also is unfounded. *See* Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 754–756, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947); Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 176 F.2d 799, 805 (1st Cir. 1949), aff'd on other grounds, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950).[24]

Because the activities of Kaiser upon which Associated attempts to base the doctrine of unclean hands were independent of the contract Kaiser seeks to enforce and were in no manner responsible for Kaiser's acquiring the contractual rights it is now seeking to have protected, Kaiser is not tainted by unclean hands in the present action, even assuming Kaiser tortiously interfered with Associated's contractual rights and engaged in anticompetitive activity.

## IV

## CONCLUSION AND ORDER

The foregoing constitutes the court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

Plaintiff's application for a preliminary injunction is hereby granted.