**MARTIN BLOOM ASSOCIATES, INC.,**
a corporation

v.

**Rick A. MANZIE et al.**

**Civ. No. LV–2101 RDF.**

United States District Court,
D. Nevada.

Feb. 13, 1975.

Theodore F. Schwartz, Ackerman, Schiller & Schwartz, Clayton, Mo., Goodman & Snyder, Las Vegas, Nev., for plaintiff.

Harry E. Claiborne, Annette R. Quintana, Las Vegas, Nev., for defendants.

## MEMORANDUM AND ORDER

CLARY, Senior District Judge, Sitting by Special Designation.

This is an action for money alleged to be due and owing plaintiff corporation from defendants for architectural and design services rendered by plaintiff to defendants pursuant to a letter agreement. The case was tried to the Court on January 22 and 23, 1975, and consequently this Memorandum and Order have been prepared.

## FACTS

Plaintiff is a Missouri Corporation with its principal place of business in Missouri and defendants, Rick A. Manzie, Barbara McNair (Mrs. Rick Manzie) and Pearl Manzie, are citizens and residents of Nevada. Defendants owned a parcel of land in Las Vegas, Nevada which they wished to develop for investment purposes. Rick Manzie testified that the moving force behind the project was his desire to provide a source of income for his wife and mother. Jerry Norber, who was associated with Manzie in the proposed apartment project, suggested that they contact Bloom, plaintiff's chairman of the board, who had previously worked with Norber on an apartment project in St. Louis, Missouri.

Norber contacted Bloom who in turn submitted a proposal (Plaintiff's Exhibit #6) to Manzie containing the following language:

We would provide all design services for this project, including all architectural, engineering, interior design services, landscape design of the premises, and supervision during construction, for the sum of $30,000.00. For the preparation of preliminary plans, specifications and rendering, sufficient to apply for mortgage financing, our fee would be $2,000.00.

On May 3, 1972 at a meeting in his home in Las Vegas with Bloom, Manzie signed this agreement after making two handwritten additions. The first provided that all working drawings be sealed by architects or engineers registered in Nevada; the second for an increase in plaintiff's fee if the number of apartments increased.

It is at this point that contradictory versions appeared in the testimony. Manzie testified that he knew nothing about construction and relied on Norber's experience. He further stated that at the May 2 meeting he told Bloom of his previous contacts with local architects and of his concern for the profita-

bility of the venture since there was an FHA project in the vicinity. Bloom then represented to Manzie that the plans would satisfy all his requirements so that he would have no difficulty in getting financing for the project and that the project would be a profitable one. Bloom indicated that an economic feasibility study which would be prepared would demonstrate this. The additional term regarding sealing the plans by an architect registered in Nevada was inserted because Manzie thought it necessary, although in response to his question Bloom had told him that plaintiff was licensed in Nevada. Manzie signed the agreement relying on Bloom's representations.

Bloom's version of the discussions is at variance with that of Manzie. Bloom contended that the entire agreement was contained in the letter signed by Manzie, and that no representation was made as to the profitability of the project. Further, Bloom brought the FHA project to Manzie's attention to insure that Manzie had considered it in his calculations. Costs of the project were discussed, but not profits.

Bloom's organization began work on the project and preliminary plans were sent to Manzie. Several of plaintiff's personnel made trips to Las Vegas to prepare for the project. Plaintiff's vice-president, Frederick Scott, contacted James Stuckey, a real estate agent in Las Vegas, soliciting his assistance in gathering information for an "economic feasibility study" for the project (Defendants' Exhibit C). Norber testified that he assisted Stuckey in gathering data for the study, although Bloom denied any knowledge of these activities and the report was apparently never completed.

A second letter was sent to Manzie by plaintiff in July of 1972. This letter restated the agreement previously signed and requested authorization to proceed with the final drawings so construction could begin in compliance with the local zoning ordinance. Manzie signed and returned this agreement on July 26, 1972. He had previously been advised by his attorney that an extension could be obtained from the zoning board without difficulty, but he testified that he signed the agreement on Norber's advice.

Manzie was also having difficulty obtaining financing for the project. Even after the construction drawings were delivered in October of 1972, Manzie was still unable to obtain financing since he was told by representatives of Sonnenblick-Goldman Company, mortgage brokers, that the drawings and specifications were incomplete in the matter of plumbing, electric, heating and air conditioning, and further that an economic feasibility study had not been completed. At about the same time, plaintiff was receiving bids from sub-contractors based on these drawings. Bloom stated it was customary in the trade to have sub-contractors supply the plans for these aspects of the project once the basic layout was done by the architect.

The project was finally abandoned when Manzie, unable to get financing, was advised that it would be a losing venture. Plaintiff's bill for services was never paid, and this suit was filed to collect the architect's fee alleged to be due.

## DISCUSSION

At a pretrial hearing, defendants were permitted to amend their answer and the pretrial order to raise specifically the affirmative defense of illegality of the contract. This issue must be resolved before proceeding to a decision on the merits. Defendants contend that plaintiff was not a licensed Nevada contractor at the time the events recited above took place, and therefore is barred by NRS 624.320 from maintaining this action.[1] As enumerated in NRS 624.020

---

1. NRS 624.320 provides: No person, firm, copartnership, corporation, association or other organization, or any combination of any thereof, engaged in the business of act-

to, "construct, alter, repair, add to, subtract from, improve, move, wreck or demolish" any building would bring plaintiff within the provisions of NRS 624.-320 as an unlicensed contractor. Plaintiff did none of these things, and undertook to do none of them, while it was unlicensed in Nevada. Plaintiff's services were limited to architectural and design plans and drawings only, activities not within the scope of NRS 624.-020.

Nevertheless, plaintiff provided architectural services to defendants while it was an architect unlicensed in Nevada. The question is thus presented whether a violation of NRS Chapter 623 carries with it the penalty specifically set forth in NRS 624.320 relating to contractors. In Nevada Equities, Inc. v. Willard Pease Drilling Co., 84 Nev. 300, 440 P.2d 122 (1968), the Supreme Court of Nevada held that when a statute provided for sanctions other than forfeiture of the right to sue on a contract, an unlicensed person was not precluded from maintaining an action to recover on the contract. This principle was applied in Robken v. May, 84 Nev. 433, 442 P.2d 913 (1968), a case involving an unlicensed architect's action to recover for services rendered. The court held that since NRS Chapter 623 provided for only criminal penalties and injunctive relief in the case of unlicensed architects, forfeiture of the right to sue was not intended and could be enforced only by express legislative mandate.[2]

Although plaintiff may well have anticipated being involved further in the project as a contractor, as indicated by its obtaining a Nevada contractor's license, it is solely the architectural aspects of the project that are at issue here. It appears to be the established policy of Nevada to treat contractors and architects differently, and since this Court sitting in a diversity jurisdiction

---

ing in the capacity of a contractor shall bring or maintain any action in the courts of this state for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that such person, firm, copartnership, corporation, association or other organization, or any combination of any thereof, was a duly licensed contractor at all times during the performance of such act or contract and when the job was bid.

The definition of "contractor" as used in NRS 624.320 is provided in NRS 624.020:

1. For the purpose of this chapter "contractor" is synonymous with "builder."

2. Within the meaning of this chapter, a contractor is any person, except a licensed architect or a registered professional engineer, acting solely in his professional capacity, who in any capacity other than as the employee of another with wages as the sole compensation, undertakes to, or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith. Evidence of the securing of any permit from a governmental agency or the employment of any person on a construction project shall be accepted by the board or any court of this state as prima facie evidence that the person securing such permit or employing any person on a construction project is acting in the capacity of a contractor under this chapter.

3. A contractor within the meaning of this chapter includes subcontractor or specialty contractor, but does not include anyone who merely furnishes materials or supplies without fabricating them into, or consuming them in the performance of, the work of a contractor.

NRS 624.030 defines "person" as used above: "Person" as used in this chapter includes an individual, a firm, a copartnership, a corporation, an association or other organization, or any combination of any thereof.

2. The Court is unpersuaded by the defendants' argument attempting to distinguish Robken and Nevada Equities on the ground that the individual was licensed, although not in the area at issue in the litigation. Being licensed in one area is no guarantee of competence in another. The Nevada Supreme Court gave no indication that such an interpretation was intended, but instead that unlicensed persons, regardless of other qualifications, engaged in an activity for which a license was required were subject only to the penalty specifically prescribed by the legislature.

case is bound to apply the law of Nevada, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L. Ed. 2079 (1945), the fact that plaintiff rendered only architectural services while unlicensed does not work a forfeiture of its right to sue for fees due under such a contract.

■ The Court must now resolve the questions presented on the merits. Plaintiff relies on the two letters as representing the complete agreement of the parties. In Alexander v. Simmons, 518 P.2d 160 (Nev.1974), plaintiff claimed that a written contract did not contain the complete agreement of the parties and that she had relied to her detriment upon oral representations made to her by the defendants. In upholding the verdict of the lower court in favor of the plaintiff, the Supreme Court of Nevada stated:

> The case law is clear that the mere existence of a written contract is insufficient to prevent a party from showing a separate and independent contemporaneous oral agreement. . . . Undoubtedly the existence of a separate oral agreement as to any matter on which a written contract is silent, and which is not inconsistent with its terms, may be proven by parol, if under the circumstances of the particular case it may properly be inferred that the parties did not intend the written paper to be a complete and final statement of the whole of the transaction between them. 518 P.2d at 161 (citations omitted).

■ This Court is therefore presented with factual questions as to whether oral representations to the effect that Manzie could get financing on the basis of the preliminary drawings; that an economic feasibility study would be prepared; and that the project would be a profitable one considering the purpose for which it was undertaken were made by Bloom on behalf of plaintiff; and if so, whether these representations were relied upon by Manzie and were part of the final agreement between the parties. The Court is of the opinion, after a close review of the evidence, that both questions must be answered in the affirmative. Further, the Court finds that implied in the complete agreement was a covenant by plaintiff that the plans and drawings would be complete and in compliance with requirements of the Las Vegas building authorities.

Throughout the two days of trial, the Court had the opportunity to observe the manner of the witnesses while they testified, the consistency of their versions, both internally and compared to those of other witnesses, the probability or improbability of their versions and their interest in the outcome of the lawsuit. Based on these factors, the Court credits the testimony of Manzie that representations of Bloom, both express and implied, induced Manzie to enter into the agreement and also constituted part of the agreement itself.

Having determined the nature of the agreement, it is now necessary to consider whether plaintiff has performed, and if not, the effect of non-performance. Plaintiff's performance comes into serious question in several areas. Manzie was advised by potential financers that no loans could be made without benefit of the economic feasibility study begun, but apparently never completed, by plaintiff. Further, not only were the preliminary plans an inadequate basis for financing, contrary to assurances by plaintiff, but even the final drawings were inadequate for this purpose. Although plaintiff introduced credible evidence that the plans and specifications were sufficient for sub-contractors to prepare bids, they were insufficient for lending purposes and Manzie was so advised by Sonnenblick-Goldman Company. In this regard, the Court credits the testimony of Manzie that Bloom agreed to revise the plans for an additional $15,000.

■■ Where the right of an architect to recover for his services is made dependent by contract on the success of

his employer in financing the building, the achievement of such financing is a condition precedent to his right to recover. Parsons v. Bristol Development Co., 62 Cal.2d 861, 44 Cal.Rptr. 767, 402 P.2d 839 (1965); Coston v. Adams, 203 Okl. 605, 224 P.2d 955 (1950). Bloom, as part of the contract, assured Manzie that financing would be easily obtainable on the basis of plaintiff's work, when such was not the case. Lack of a feasibility study and inadequate drawings made Manzie's success impossible.

Manzie testified that rather than being a profit making venture, potential lenders had advised him that the project based on plaintiff's drawings and specifications would lose approximately $1,000 per month. Where the architect places an economic limit on a project by agreeing that it will fulfill certain pre-determined conditions (here that the apartments could be built according to his plans and still be profitable considering all relevant factors), and it materially fails to do so, then he can obtain no recovery because of his own non-performance. Spurgeon v. Buchter, 192 Cal.App.2d 198, 13 Cal.Rptr. 354 (1961); see Rowell v. Crow, 93 Cal. App.2d 500, 209 P.2d 149 (1949); Bebb v. Jordan, 111 Wash. 73, 189 P. 553 (1920). Neither can the architect recover in quantum meruit since the plans, by failing to conform to the agreement in material aspects, are worthless to the owner and no benefit to him. Spurgeon v. Buchter, *supra*; Rowell v. Crow, *supra*.

The evidence is unclear as to whether the drawings were ever submitted to Las Vegas building authorities for approval, but when supplied to Manzie there were gaps in the drawings in the designs for the electrical, plumbing and heating and air conditioning systems. Testimony indicated the importance of these systems in an apartment complex, and there is no doubt that they were not complete on the final drawings sent to Manzie. Bloom testified that such was the custom in the trade and that the sub-contractors would provide the further drawings necessary. In the contract, plaintiff specifically agreed to, " . . . provide *all* design services for this project, including *all* architectural, engineering, interior design services. . . . " (emphasis added). Plaintiff should have required the sub-contractors to supply plans before submitting the drawings to Manzie as final. When the drawings were sent to Manzie and payment requested, no agency could approve them in such "final" form.

Since plaintiff has been guilty of material breach by non-performance as indicated above, defendants are excused from performing their obligations under the agreement. Restatement Contracts §§ 274, 275; Wells Benz, Inc. v. United States for Use of Mercury Elec. Co., 333 F.2d 89 (9th Cir. 1964); Kaiser Trading Co. v. Associated Metals & Minerals Corp., 321 F.Supp. 923 (N.D.Cal.1970), appeal dismissed, 443 F.2d 1364 (9th Cir. 1971).

The above discussion shall constitute the Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## JUDGMENT

And now to wit, this 13th day of February 1975, on the basis of the memorandum opinion filed concurrently herewith, it is ordered, adjudged and decreed that judgment be entered in favor of all of the defendants and against plaintiff together with the appropriate legal costs.